### In re Southwestern Vermont Education Association and Mount Anthony Union High School Board of School Directors

[396 A.2d 123]

No. 119-77

Present: Barney, C.J., Daley, Larrow, Billings and Hill, JJ.

Opinion Filed October 30, 1978

*Gary H. Barnes* and *Robert D. Rachlin* of *Downs, Rachlin and Martin,* South Burlington, for Petitioner.

*David A. Jenkins* and *Bret P. Powell* of *Hoff, Wilson & Jenkins,* Burlington, for Respondent.

**Larrow, J.** Appellee Association, seeking recognition as the exclusive agent for a nonteacher bargaining unit of employees of the appellant School Board, brought a complaint before the Labor Relations Board on behalf of itself and several of its members, claiming unfair practices by the employing unit. The gravamen of the charge was that, in the midst of a labor dispute, the School Board suddenly decided to opt for contractual janitor services at its high school, thereby terminating the job status of the employees involved, only one of whom was transferred to other employment. The Labor Relations Board found the charge to be supported, and ordered that employment be offered to the terminated employees. The School Board has appealed, claiming that the janitorial contract was to serve a substantial and legitimate business end, that there was no evidence to support the existence of "antiunion animus" on the part of the School Board, and that the School Board was unaware of organizational activities on the part of the custodians. More particularly, it attacks the conclusion that termination of the custodians was "inherently destructive" of their rights. It also argues that the finding

that there was no anti-union animus shown on the part of School Board members requires dismissal of the charge, since the School Board, and not the District, was the party complained against. We are convinced that the claim relating to party status is without merit. We are not directed to any portion of the record indicating that this claim was made below. On the contrary, the whole record supports appellee's contention that the matter was tried on the theory that the District was the offending party. Amendment would only be a formality, and one well within the purview of 21 V.S.A. § 1727(a), permitting liberal amendment of complaints by the Board. The niceties of common law pleading should have even less application in administrative proceedings than in our trial courts, where liberality of amendment to conform to trial theory is established by rule. V.R.C.P. 15(b). We will, therefore, treat the assignments of error as they apply to the District in its corporate capacity, since the District is clearly the employer here (21 V.S.A. § 1735) and the case below was tried upon that general theory. The actions of supervisory personnel of a school district have been held to be attributable to it in determining whether a district has committed an unfair labor practice, on the theory that a contrary holding would permit a school board to tacitly engage in unfair labor practices, with the employees discriminated against having no effective recourse, thus depriving the unfair labor practice prohibition of any real substance. *Muskego-Norway Consolidated Schools Joint School District No. 9* v. *Wisconsin Employment Relations Board*, 35 Wis. 2d 540, 151 N.W.2d 617 (1967).

The particular thicket of labor law in which we presently find ourselves is one through which our own cases have laid out few trails. But we have looked to federal decisions, under parallel legislation, for guidance on other occasions, and that procedure seems appropriate here. *Ohland* v. *Dubay*, 133 Vt. 300, 336 A.2d 203 (1975).

Apart from its conclusion that the members of the School Board were not shown to have "anti-union animus," the findings that an unfair labor practice had been committed are amply supported by the record. Despite this personal "clearance" the Board concluded that the School Board as

such was unhappy with the attitude of some of the custodians involved, and that the District was aware of the longstanding efforts to organize. In this climate, the Board rightly concluded that the decision to contract for custodial services was motivated, at least in part, by unlawful considerations, the test we have approved in *Dubay, supra.* Unlawful motivation may, under *Dubay* and the cases therein cited, be inferred from knowledge of union activity, a "climate of coercion," and a "suspect" timing of the employee discharge.

■ All of these elements were present in the instant case. The School Board clearly knew of union activities; it had before it a petition for union recognition, it had obtained labor counsel to represent it, and its superintendent had issued an anti-union memorandum to all employees. The whole record shows a bitter controversy, with active opposition to the union. This is justifiably held to constitute a "coercive climate." *Bryant Chucking Grinder Co.* v. *N.L.R.B.,* 389 F.2d 565 (2d. Cir. 1967).

■ In addition, the findings demonstrate that the School Board decision to contract out custodial services, and to discharge union adherents, was made at a suspicious time and under suspicious circumstances. The idea had been considered and rejected some two years before. At the June 9, 1975, meeting of the School Board it was recommended that the idea be shelved for one or two years. But after the union sought recognition, the idea was quickly resurrected and speedily put into effect. A trial sixty day contract, previously required by the superintendent, was abandoned, and the contract was let for a full year. It began in the middle of the school year, applied only to the senior high school, rather than the District generally, and five (out of six) employees known to be involved in labor organizational activity were discharged. Even granting the argument, somewhat tenuous under the circumstances here, that legitimate business considerations were involved, the precipitous manner in which the previously rejected concept was put into effect when union activity began warrants the finding of an unfair labor practice. *Syufy Enterprises,* 220 N.L.R.B. 738, 741, 90 L.R.R.M. 1289, 1292 (1975); *Larry Barnes Chevrolet Co.,* 174 N.L.R.B. 818, 820,

70 L.R.R.M. 1350 (1969). Valid business considerations may have influenced the decision, but they were not the *sole* basis for it required to negate such unfairness. *N.L.R.B.* v. *Townhouse T.V. & Appliances, Inc.*, 531 F.2d 826, 828–29 (7th Cir. 1976).

▮ It is probably true, taking the record as a whole, that there is an absence of direct evidence of unlawful employer motivation for the actions taken. The Board recognized this, but justified its conclusions on the reasoning of *N.L.R.B.* v. *Great Dane Trailers, Inc.*, 388 U.S. 26 (1967). Under that leading case, when "inherently destructive" conduct on the part of the employer is involved, no direct proof of anti-union motivation must be shown to establish a prima facie case. The employer, under such circumstances, has the burden of explaining his actions to avoid the charge of unfair labor practice. Our act is comparable to the National Labor Relations Act. *Ohland* v. *Dubay, supra. Great Dane* is therefore persuasive, and the adoption of its rule by the Board fully justified. As pointed out *supra*, we have already approved the practice of inferring unlawful motivation from attending circumstances. *Ohland* v. *Dubay, supra*, 133 Vt. at 302–03, 336 A.2d at 205.

The *Great Dane* rule distinguishes between conduct "inherently destructive" of important employee rights, and instances where the adverse effect of such conduct is "comparatively slight."

> First, if it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of important employee rights, no proof of an anti-union motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct. . . . [I]n either situation, once it has been proved that the employer engaged in discrimi-

natory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him.

*Id.* at 34.

In this case, the Board reasonably concluded that the employer conduct was "inherently destructive" of union employee rights. It resulted in their discharge from employment, it was done speedily in the middle of a union controversy, and it was done on terms which had previously been found unacceptable. The record supports the conclusion of inherent destructiveness. That conclusion is not only well within the special expertise of the Board, *Ohland* v. *Dubay, supra,* 133 Vt. at 303, 336 A.2d at 205, it is virtually compelled by the factual situation. Cf. *Federal Prescription Service, Inc.* v. *N.L.R.B.,* 496 F.2d 813, 817–18 (8th Cir.), *cert. denied,* 419 U.S. 1049 (1974) (discharge of nine out of ten employees who signed union authorization cards); *N.L.R.B.* v. *Midwest Hanger Co.,* 474 F.2d 1155 (8th Cir.), *cert. denied,* 414 U.S. 823 (1973) (discharge of some union leaders during an organizational campaign). Although improper motivation was denied, the bare denial cannot fly in the face of all the surrounding circumstances, and the Board's conclusion that an unfair labor practice had been committed is fully sustained.

*Judgment affirmed.*