## Grievance of Gene V. McCort

[650 A.2d 504]

No. 93-237

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed September 2, 1994

*Gene V. McCort,* pro se, Montpelier, Plaintiff-Appellee.

*Jeffrey L. Amestoy,* Attorney General, and *Michael Seibert,* Assistant Attorney General, Montpelier, for Defendant-Appellant.

**Dooley, J.** The State of Vermont appeals from a decision of the Vermont Labor Relations Board rescinding grievant Gene McCort's dismissal, reducing the penalty to a six work-week suspension without pay, and ordering him reinstated to his position as an auditor with the Agency of Transportation. With the exception of a September 6, 1991 written reprimand of grievant, which we reverse and remand for further proceedings, we affirm.

Grievant originally filed three separate grievances with the Vermont Labor Relations Board (Board), alleging that the Agency of Transportation (AOT or employer) had violated various provisions of the collective bargaining agreement between the State and the Vermont State Employees' Association (VSEA) in effect for the period July 1, 1990 through June 30, 1992. The Board consolidated the three grievances for hearing. See *In re McCort,* 16 V.L.R.B. 70 (1993) (Docket Nos. 91-57, 92-9, 92-26).

Grievant began his career with the AOT in July 1989 in the position of Auditor B. He was a member of a four-person staff of "external

auditors" responsible for reviewing the records of companies having contracts with AOT to determine whether the companies were in financial and contractual compliance. This position, and the position of Auditor C to which grievant was promoted after six months, required grievant to have a great deal of direct contact with contractors. During his three-year career with AOT, with the exception of one interim appraisal, AOT rated grievant's work performance as "Satisfactory" in each of his annual performance appraisals. Following a series of disputes with AOT management dating back to just over a year after grievant began his job, however, AOT dismissed grievant in May 1992.

## I.

### A.

Employee's first grievance arose out of his conduct on May 24, 1991. This grievance was covered by Board Docket No. 91-57, and we will refer to it later as the No. 91-57 grievance. On May 24th, grievant had completed an audit of Company A, in which he expressed serious concerns to AOT management concerning certain company reporting practices and the company's unwillingness to provide grievant access to what he considered necessary financial documents. As discussed in more detail below, grievant believed that his superiors improperly intervened in this audit and prevented him from pursuing an important line of inquiry. On the day in question, grievant improperly took from his supervisor's desk a confidential memo from the AOT Assistant Director for Financial Services which criticized grievant's audit. In a meeting that day, grievant made inappropriate remarks to the AOT Director of Administration. In another meeting, he made derogatory remarks about Jewish businessmen. As a result of grievant's conduct on the 24th, his supervisor issued him a written reprimand on May 31st.

Grievant challenged this decision on June 20th, and it went through the grievance process.[1] Some time prior to August 26, 1991, grievant

---

[1] The State-VSEA collective bargaining agreement attempts to resolve employer-employee disputes within the individual state departments before appeal to the Board. A Step I complaint is heard by the employee's immediate supervisor, and may be filed orally within fifteen days of the action giving rise to the complaint. If there is no satisfactory resolution at this level, the employee may file a Step II grievance, which requires a written grievance, and is heard at the department level. The next level of appeal, the Step III grievance, is heard at the agency level. Appeal from a Step III grievance goes to the Board.

informed his supervisors that he intended to appeal the denial of the grievance to the Board, which he did on September 10, 1991.

This grievance is significant primarily because the Board found later State actions were motivated, at least in part, by response to the Board appeal in this grievance. The State prevailed on this grievance and, as a result, did not include it in its appeal. Although grievant did not file a cross-appeal, he has argued in his brief that the Board should have upheld his grievance, and this Court should reverse the Board's failure to do so. Since this decision is not before us in the State's appeal, we are unable to consider it. See *Miller v. A. N. Deringer, Inc.*, 146 Vt. 59, 60, 498 A.2d 501, 503 (1985). This is not a case where appellee is content with the judgment but seeks to raise additional claims if it is reversed.

### B.

Board Docket No. 92-9 represents five consolidated grievances. The first of the five grievances arose out of events which occurred in late August 1991. On August 23, grievant returned from a week-long audit in New Jersey to find that his supervisor had removed grievant's personal audit reference files from his office. These consisted of copies of audits grievant had done in the past. Grievant found them in the supervisor's unlocked office, retrieved them and locked them in his car. When the supervisor found the files missing, he ordered grievant to return them by 10:30 a.m. Grievant requested and was given permission to attempt to contact his attorney prior to returning the files. Due to a delay in reaching his attorney, grievant did not return the files until 11:00 a.m. The following day the supervisor suspended grievant for one day without pay for failing to follow his direct order. The grievance Step III hearing officer, the Human Resources Director for the Department of Personnel, ordered this suspension reduced to a written reprimand.

The second incident occurred on September 6. Grievant was issued a written reprimand for a comment he made the previous March to an officer of a company he was auditing. He said to the officer, who had a southern accent, that Vermonters might be ignorant but Southerners were stupid. Grievant's supervisor became aware of this comment in late August, and asked the officer to send him a letter detailing the incident, which arrived on August 27th. The supervisor also directed grievant to send a letter of apology and was displeased when grievant's letter disputed that the incident occurred as alleged. The Step III hearing officer upheld this reprimand.

The third grievance in this series also arose in September. On September 10, with several grievances pending, grievant requested of his supervisor office time during which to work on his grievances. The supervisor agreed but, by memorandum to grievant, limited such activities to one hour per workday. The grievance over this time restriction was also upheld by the Step III hearing officer.

The fourth grievance was related to the third. To resolve the third grievance issue, in part, grievant was allowed by an acting supervisor to use personal and leave time to work on his grievances. Up to this time, grievant had been using AOT computers to draft his grievances. On September 11, the acting supervisor informed grievant that he was not allowed to use the state computer for personal business, and in particular, when on leave time. Grievant refused to stop until the order was put in writing and the acting supervisor produced the written policy on which the order was based. He then ceased using the computer.

On Friday, September 13, grievant's supervisor informed grievant that he had prepared a disciplinary action, and that grievant had the right to have his attorney present when the supervisor presented the action to him. On Monday, September 16, grievant requested that the supervisor delay his disciplinary action until Wednesday as grievant's attorney would not be available until that time. The supervisor refused and issued grievant a five-day suspension without pay for using state property to conduct personal business and for ignoring the acting supervisor's order to cease such use. The Step III hearing officer ordered this suspension expunged because of ambiguity regarding the acting supervisor's orders.

The fifth and final grievance in this series developed one month later. On October 11, 1991, grievant was given an interim performance evaluation covering the period January 1 to September 30, 1991. His rating was "Unsatisfactory," and he was placed on a three-month prescriptive period of remediation. The Step III hearing officer upheld the remediation period.

Grievant completed the prescriptive period and was given a "Satisfactory" evaluation in his January 1992 annual appraisal. During the prescriptive period, grievant was suspended for one day without pay for remarking to the Executive Director of the Human Rights Commission, "Do you want a piece of candy little girl?" Grievant did not grieve this suspension.

Following the Step III hearing officer's decision in February 1992, grievant appealed the five individual grievances to the Board in

Docket No. 92-9. On appeal, the Board found the employer's actions in violation of the collective bargaining agreement, ruling that they were taken in response to grievant's grievance activities and were without just cause. The Board ordered the written reprimand, the two suspensions, and the adverse performance evaluation and prescriptive period of remediation rescinded. The Board further ordered the Agency to remove all references to all such disciplinary actions from grievant's employment file. The State has appealed this decision.

## C.

In Docket No. 92-26, grievant appealed the AOT decision to terminate him. As discussed below, the AOT terminated the grievant because of the events described above and one further event. Two months after filing the Docket No. 92-9 grievance with the Board, grievant attended an April 30 hearing between AOT and Company A at which the company sought to contest the final audit report. After filing his preliminary audit, grievant had been taken off the contract, and had not seen the final audit. He had previously told his supervisor that he did not want to attend this hearing, and he did not stay long. He was given a copy of the final two-page report, which had been reduced by his supervisor from his original twelve-page submission. He stated, "[A]nyone who reduced my twelve page report to two pages is a fool." He then attempted to question Company A's representatives, its president and its attorney, directly. When the AOT Deputy Secretary, who was serving as hearing officer, informed grievant that he would conduct the hearing, grievant responded by telling the Deputy Secretary not to be so arrogant. Grievant was then ordered out of the hearing. That night, grievant's supervisor placed grievant on paid administrative leave for the following day and thereafter extended it while AOT investigated grievant's conduct at the April 30 hearing. Following an opportunity for grievant to respond to a specification of grounds, grievant's employment was terminated on May 22, 1992, effective immediately.

The termination letter detailed the April 30th incident, describing grievant's actions as "highly unprofessional, insubordinate, and disruptive of the hearing process." It then itemized "other unprofessional conduct," including (1) the disciplinary actions covered by Docket No. 91-57, (2) the suspension (reduced to a reprimand) for failing to return the copies of the audit reports by the specified deadline, (3) the suspension (which was expunged on grievant's appeal) for failing to cease using the state computer for drafting of

grievance documents, (4) the comment to the director of the Human Rights Commission that resulted in a one-day suspension, and (5) grievant's conduct at the April 30th hearing, as set out above.

The substantive part of this letter concluded with the following statement:

> As a result of the combined effect of your actions described above, and other actions as to which you have been counseled, there is just cause for your dismissal. Your actions have convinced the Agency that you can not be trusted to conduct objective and unbiased audits on its behalf.

On May 28, 1992, grievant appealed his dismissal to the Board. The Board concluded that grievant's dismissal was motivated in part by response to his grievance activity and that dismissal would not otherwise have been imposed on grievant although his misconduct was serious. Instead, the Board concluded that the maximum sanction indicated was a "stiff suspension" of thirty working days and ordered him reinstated with back pay and interest less the amount that would have been earned during the suspension period.

## II.

■ Although the State has appealed the decisions in Docket No. 92-9 and Docket No. 92-26, its focus is on the decision in Docket No. 92-26 that just cause did not exist to terminate grievant. The first point of the State's argument is that the Board improperly construed the dismissal letter as terminating grievant for all the misconduct itemized. The State argues that the proper interpretation of the letter is that grievant was terminated for his misconduct on April 30, 1992 at the audit hearing. In the State's view, the remainder of the grounds cited in the letter were to show that progressive discipline had been employed.

The Board's interpretation of the termination letter is supported by the plain meaning of the language; dismissal was imposed "[a]s a result of the combined effect of [grievant's] . . . actions described above, and other actions as to which you have been counseled . . . ." Moreover, the Board acted properly in evaluating only the grounds specified in the termination letter, and the termination meeting. See *In re Merrill,* 151 Vt. 270, 276, 559 A.2d 651, 655 (1988).

■ The Board also concluded that the State could not rely on the reference to other unspecified misconduct because the reference was "too vague to allow Grievant to defend against the charges." *McCort,*

16 V.L.R.B. at 122. This conclusion is supported by our decisions requiring fair notice of the grounds for termination. See, e.g., *In re Yashko*, 138 Vt. 364, 366, 415 A.2d 1322, 1323–24 (1980).

Pursuant to the Board's interpretation of the termination letter, it evaluated all of the grounds cited to determine whether in the aggregate they established just cause for dismissal. Necessarily, the Board was required to discount or ignore grounds it found to be improper. We see no error in the logic of the Board's approach.

## III.

The State's next claim is that the Board did not apply the correct employment discrimination law so that the burden to prove absence of discrimination was improperly placed on the State. This issue is also central to the Board's analysis of the grievances. As claimed by grievant, the Board found that the actions of the State in imposing the discipline complained of in Docket No. 92-9 and the dismissal complained of in Docket No. 92-26 was in retaliation for grievances filed by grievant. In reaching this decision, the Board went through the following logical steps. First, it found that grievant had grievances pending when AOT took the action complained of and AOT was aware of the grievances. Second, it found, primarily from the timing of the State's actions and the lack of a sufficient explanation for them, that retaliation for grievant's grievances was a motivating factor for the disciplinary actions and the dismissal. Third, it shifted to the State the burden to show that it would have imposed the discipline and would have terminated grievant even if he had never filed grievances. Fourth, it concluded the State failed to make the proper showing. *McCort*, 16 V.L.R.B. at 106–09.

Certain parts of the Board's analysis are conceded. By virtue of the applicable collective bargaining agreement, a state employee has a vested property interest in continued employment, *In re Muzzy*, 141 Vt. 463, 472, 449 A.2d 970, 974 (1982), and cannot be disciplined or terminated except for just cause. *In re Brooks*, 135 Vt. 563, 568, 382 A.2d 204, 207 (1977). Under the State-VSEA contract, every employee may freely institute complaints and/or grievances without threats, reprisal or harassment by the employer. The State may not retaliate against the exercise of this right by discipline or termination.

The Board found that the critical precedent in analyzing this kind of retaliation case is *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274 (1977), in which the plaintiff, a school teacher,

alleged that he was not rehired by the Board of Education because of unfavorable statements he made about certain school policies. *McCort,* 16 V.L.R.B. at 105–06. Although *Mt. Healthy* is a constitutional decision, we agree that its analytical approach is an appropriate model because we face the same problem of allocating burdens of persuasion and production where the employer's motives may be mixed. Other states have adopted a burden-shifting rule parallel to that in *Mt. Healthy.* See *In re Professional Firefighters Local 3353,* 635 A.2d 1352, 1354 (N.H. 1993). Indeed, our unfair labor practice decisions have engaged in analysis very similar to that in *Mt. Healthy* where anti-union motivation is alleged to be a part of the employer's actions. See *Kelley v. Day Care Center, Inc.,* 141 Vt. 608, 613–15, 451 A.2d 1106, 1109 (1982); *In re Southwestern Vt. Educ. Ass'n,* 136 Vt. 490, 493–94, 396 A.2d 123, 124–25 (1978); *Ohland v. Dubay,* 133 Vt. 300, 302–03, 336 A.2d 203, 204–05 (1975).

In *Mt. Healthy,* the employer disputed the teacher's assertion and claimed he was not rehired for unrelated misconduct. Characterizing the case as one involving mixed motives, the Court held that an employee must show that he or she was engaged in constitutionally protected conduct, and that such conduct was a substantial or motivating factor in the employer's action. *Mt. Healthy,* 429 U.S. at 287. If the employee makes such a showing, the Court ruled that the burden of persuasion then moves to the employer to prove "by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Id.* The Court reasoned that this allocation of burdens ensures that an employee is

> placed in no worse a position than if [the employee] had not engaged in the [protected] conduct. . . . But that same [employee] ought not to be able, by engaging in such conduct, to prevent [the] employer from assessing his performance record and reaching a decision to [terminate] on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

*Id.* at 285–86.

The State argues that the Board misapplied *Mt. Healthy* because grievance retaliation was found to be a motivating but not a substantial factor. Moreover, the State contends there was no direct evidence that AOT was motivated at all by the grievances. In the State's view, the Board should have applied the traditional burdens of proof as set

out in such cases as *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Its analysis relies on Justice O'Connor's concurrence in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 260–80 (1989) (O'Connor, J., concurring), a Title VII mixed motive case.

Because the State relies heavily on it, we have looked at *Price Waterhouse*, a 4-1-1 plurality decision in which Justices White and O'Connor concurred separately. Justice O'Connor's concurrence suggests that the burden of production does not shift to the employer in a mixed-motive Title VII case unless there is direct evidence that an improper consideration was a substantial factor in the employment decision. *Id.* at 276 (O'Connor, J., concurring). In contrast, the plurality held that once a plaintiff showed that a protected factor "played a motivating part in an employment decision, the [employer] may avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed [the protected factor] to play such a role."[2] *Id.* at 244–45. The plurality also held that the employer's burden "is most appropriately deemed an affirmative defense: the plaintiff must persuade the factfinder on one point, and then the employer, if it wishes to prevail, must persuade it on another." *Id.* at 246; see also *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 400 (1983) (when employee has proved that his union activity was substantial or motivating factor in his discharge, employer's proof that it would have discharged employee in absence of union activity and for valid reasons "amounted to an affirmative defense on which the employer carried the burden of proof").

Justice O'Connor accepted the plurality rule as applied to the facts in *Price Waterhouse* because there was testimony that a number of partners made gender-biased comments in refusing to promote plaintiff to partner. *Price Waterhouse*, 490 U.S. at 267–68 (O'Connor, J., concurring). She opposed its use, however, in the normal Title VII case based on "statistical proof." *Id.* The State argues we should adopt this distinction regarding the necessity of direct evidence, and hold that there is no direct evidence in this case.

---

[2] We recognize that the impact of *Price Waterhouse* has been modified by the enactment of the Civil Rights Act of 1991 with respect to the remedies available to a Title VII plaintiff when the plaintiff proves unlawful discrimination, and the employer is able to show that it would have made the same decision in the absence of the impermissible factor. See Civil Rights Act of 1991, P.L. 102–166, § 105(b), codified at 42 U.S.C. § 2000e-5g (§ 706(g)(2)(B)). That modification, however, does not disturb the Court's discussion of burdens of proof.

■ First, we think the distinction between a "substantial" factor and a "motivating" factor is a quibble. *Mt. Healthy* used these terms as synonyms, *Mt. Healthy*, 429 U.S. at 287, and we have used them interchangeably. See *Graff v. Eaton*, 157 Vt. 321, 324, 598 A.2d 1383, 1384 (1991) (citing *Price Waterhouse* for proposition that once employee has proved illegitimate factor was a motivating factor, burden shifts to employer). This is the same standard that the Supreme Court has also endorsed in the context of an analogous employee action for retaliation brought under the National Labor Relations Act. See *Transportation Management Corp.*, 462 U.S. at 400 (employee must show that union activity protected under NLRA was "a substantial or a motivating factor in the discharge"). There is no suggestion that the Vermont Labor Relations Board thought that response to the grievance activity was an insubstantial factor in the disciplinary actions and grievant's dismissal.

■■ Second, regarding whether a plaintiff must put forth direct evidence of an improper motive, we emphasize that we are using the United States Supreme Court decisions as responses to analogous circumstances and not as governing precedents. Our decisions have clearly authorized the use of circumstantial evidence to show that one of the employer's motives was improper in mixed-motive cases. See *In re Regan*, 153 Vt. 333, 337, 571 A.2d 664, 666 (1989); *Kelley v. Day Care Center, Inc.*, 141 Vt. at 613, 451 A.2d at 1108–09; *In re Southwestern Vt. Educ. Ass'n*, 136 Vt. at 494–95, 396 A.2d at 125–26. When we look for an analogy, we find our case is far closer to *Mt. Healthy* than to *Price Waterhouse*, a statutory Title VII case. There is nothing in *Mt. Healthy* to suggest that presence of an improper motive must be shown by direct evidence. Decisions following *Mt. Healthy* have routinely relied upon circumstantial evidence to show that an improper factor motivated the employment action. See, e.g., *Ware v. Unified School Dist.*, 881 F.2d 906, 911 (10th Cir. 1989).

Even if *Price Waterhouse* were the governing precedent, we do not agree that we should take its holding exclusively from Justice O'Connor's concurrence or that her opinion has the meaning the State attributes to it. In *Graff v. Eaton*, a decision relying directly on *Price Waterhouse*, we took the applicable standard from the plurality opinion and not from the concurrence. See 157 Vt. at 324–27, 598 A.2d at 1384–86; see also *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1183 (2d Cir. 1992) (majority of Court in *Price Waterhouse* endorsed *Mt. Healthy* framework and did not require direct evidence of improper motivation). There was no suggestion in *Graff* that a specific

type of evidence was necessary to shift the burden of production as long as the fact-finder found the presence of an impermissible motive by a preponderance of the evidence. See 157. Vt. at 325–26, 598 A.2d at 1385.

Moreover, we do not read Justice O'Connor as creating any significant distinction between circumstantial and direct evidence. Any emphasis she placed on direct evidence was used to distinguish the framework she outlined in *Price Waterhouse* from that in *McDonnell Douglas.* See *Tyler v. Bethlehem Steel Corp.,* 958 F.2d at 1186. In *McDonnell Douglas,* a decreased burden of persuasion is shifted to the employer only when the plaintiff's prima facie case is established. *Price Waterhouse,* 490 U.S. at 278 (O'Connor, J., concurring). The plaintiff establishes the prima facie case upon a showing that plaintiff was a member of a protected group, was qualified for an open job but was rejected, and that the job remained open. *Id.* In O'Connor's *Price Waterhouse* framework, however, a more stringent burden of persuasion shifts to the employer when the plaintiff establishes not only the prima facie case, but also provides specific evidence of discrimination. *Id.* In other contexts, we have rejected artificial distinctions between propositions proved by circumstantial evidence and those proved by direct evidence. See *State v. Derouchie,* 140 Vt. 437, 445, 440 A.2d 146, 150 (1981) (rejecting differential treatment of circumstantial and direct evidence in criminal cases). We do not believe that Justice O'Connor intended to resurrect such inappropriate distinctions.

## IV.

### A.

Having concluded that the Board correctly allocated the burdens of production and persuasion in accordance with *Mt. Healthy,* we turn now to the State's contention that the Board improperly applied the law to the facts in both dockets. Although the State is primarily concerned with the dismissal decision in Docket No. 92-26, we begin with the analysis of the disciplinary actions in Docket No. 92-9, as the Board did, because these grievances underlie the State's ultimate decision to terminate grievant. We emphasize that our standard of review is limited. We will not disturb the Board's findings of fact absent a showing that the challenged findings are clearly erroneous. *In re Merrill,* 151 Vt. at 273, 559 A.2d at 653. Further, we will uphold the Board's conclusions of law if supported by the findings. *Vermont*

*State Colleges Staff Fed'n v. Vermont State Colleges,* 157 Vt. 645, 646, 596 A.2d 355, 356–57 (1991) (mem.).

## B.

█ As set forth above, grievant clearly met the first prong of the *Mt. Healthy* test. *Mt. Healthy,* 429 U.S. at 287 (employee must first show conduct is protected). The real dispute here is about the second *Mt. Healthy* prong, which requires the employee to prove that his conduct was a substantial or motivating factor in the employer's actions. See *id.;* see also *In re Morrissey,* 149 Vt. 1, 14 n.3, 538 A.2d 678, 687 n.3 (1987) (protected conduct must be "substantial factor in the termination decision"). Absent specific, direct evidence that AOT was motivated by retaliation for grievant's grievance activities, the Board may look to a number of indicia of improper motivation we have developed in unfair labor practice decisions involving claims of anti-union retaliation. These include "whether the employer knew of the employee's [protected] activity . . ., whether there was a climate of coercion, and whether the timing of discharge was suspect." *Ohland v. Dubay,* 133 Vt. at 302–03, 336 A.2d at 205. A climate of coercion is one in which the employer's "conduct may reasonably be said to have a tendency to interfere with the free exercise of employee rights." *Ralph's Toys, Hobbies, Cards & Gifts, Inc.,* 272 N.L.R.B. 164, 164 (1984) (discussing NLRA proscription on interference, coercion and restraint). The critical inquiry is not whether the coercion succeeded or failed, but whether the employer's conduct reasonably tended to interfere with or restrain an employee's exercise of protected rights. See *NLRB v. Shelby Memorial Hosp. Ass'n,* 1 F.3d 550, 559 (7th Cir. 1993); see also *International Bro. of Elec. Workers v. NLRB,* 487 F.2d 1113, 1126 (D.C. Cir. 1972), *cert. denied,* 418 U.S. 904 (1974) (concern is with subjective effect of employer's actions).

We reiterate the use of the *Ohland* factors. We emphasize, as we did in *Kelley v. Day Care Center, Inc.,* 141 Vt. at 613, 451 A.2d at 1108, that *Ohland* actually states a nonexclusive list of circumstances which were particularly relevant to the facts of that case.

█ The first disciplinary action analyzed by the Board was the one-day suspension imposed for taking the files from the office of grievant's supervisor. The Board noted that this action was taken after grievant announced his intention to appeal to the Board in Docket No. 91-57. It found the supervisor's reason for removing them from grievant's office—to prevent grievant from going to the news

media with them—to be weak and unsupported by the evidence. See *NLRB v. Shelby Memorial Hosp. Ass'n,* 1 F.3d at 568 ("an implausible explanation for the discharge" is circumstantial evidence of improper motive); *Ware v. Unified School Dist.,* 881 F.2d at 911 (plaintiff creates reasonable inference of improper motivation by showing "the reasons proffered for the adverse action are without factual support"). It found that although a specific deadline was set for grievant to return the files, the supervisor acted inconsistently in giving grievant an opportunity to contact counsel but disciplining him for being thirty minutes late in returning the files after he attempted unsuccessfully to reach counsel. The Board found in the latter actions a climate of coercion because grievant could not rely on the oral representations of his superiors. The Board's conclusions are supported by its findings, which in turn are supported by the evidence. The Board could conclude that the supervisor's actions were motivated in part by retaliation against grievant for his grievance activity.

The Board's analysis of the five-day suspension for failing to follow the acting supervisor's order to stop using the state computer for grievance drafting was similar. Although this discipline had been expunged before it reached the Board, the Board examined it because it was a ground for the termination decision and it was relevant to the employer's overall motives. The Board found the timing of this action was also suspicious because it occurred on the day after grievant actually appealed his grievance to the Board in Docket No. 91-57. It found the action unwarranted because there was "no reasonable basis by which to conclude that Grievant had refused to obey a direct order by a supervisor" and emphasized that grievant was not allowed to tell his side of the story before the discipline was imposed. *McCort,* 16 V.L.R.B. at 116. Again, we conclude that the Board's decision that grievance retaliation motivated the employer's actions, at least in part, is supported.

For similar reasons, we uphold the Board's finding of improper motivation for the period of remediation and the reprimand for the insults of Southerners in the statements to the company officer.

We also uphold the Board's decision that the State's termination of grievant was motivated, at least in part, by retaliation for his grievance activities, although we agree with the State that the question is a close one. In its reasoning, the Board first noted that two of the stated reasons for dismissal—the failure to return the duplicate files by the deadline imposed by grievant's supervisor and the refusal

to follow an order that he discontinue using the AOT computer for grievance work—could not be relied upon by the State. In fact, the Board labeled it "inappropriate and inexcusable" that the latter of these two grounds was relied upon because the disciplinary action for this conduct had been ordered to be expunged. *McCort,* 16 V.L.R.B. at 122.

The Board reached its conclusion in large part because of its conclusion about the grievances in Docket No. 92-9 that the severe nature of the discipline imposed "cast substantial doubt that the dismissal was properly motivated." *Id.* at 125. The Board was also influenced by the fact that the employer relied in part on the misuse of computer equipment when the discipline for that action had been expunged. This reliance demonstrated to the Board that the [E]mployer continued to hold Grievant's grievance activities against him. *Id.* Related in the Board's view was a February 1992 memo from the AOT personnel officer, the person who signed grievant's letter of termination, to the AOT Secretary detailing all the disciplinary action against grievant and criticizing a grievance decision favorable to grievant as a "very bad decision." The Board viewed this memo as reinforcing its conclusion that AOT was still acting out of pique at grievant's grievance activities. *Id.* at 126.

The State strongly disputes the Board's analysis, but its arguments generally seek a different evaluation of the evidence rather than demonstrating reversible error. It would have us rule as a matter of law that the unlawful motivation had abated by the time of the dismissal, as evidenced by the fact that following the period of remediation AOT gave grievant a satisfactory performance rating and thereby removed him from a termination track. Thus, the State argues, the termination was caused solely by the April 30th misconduct, which the Board agreed was extremely serious. Although this argument has force, it is undercut by the termination letter that listed other grounds for the termination and relied on one ground that had been expunged and another that was found to be motivated by grievance retaliation.

## C.

Once the burden shifted to the State, it was up to the State to show that the specific action would have been taken even if no improper motive were involved. With respect to the disciplinary actions involved in Docket No. 92-9, the Board ruled that the State failed to meet this burden. We find no error in the Board's analysis of the

suspension for failure to return the files, the expunged suspension for failure to desist from using the AOT computer for grievance drafting, and the period of remediation. In each case, the Board relied upon the weak or nonexistent rationale for the State's action to conclude the State failed to meet its burden. Its conclusion is supported by its findings.

We cannot agree with the Board's analysis of the complaint from the officer of the audited company about grievant's description of Southerners. Although there was sufficient evidence to shift the burden to the State to explain its action, the Board failed to evaluate properly the State's explanation. The Board found that "Employer did not explain at the hearing under what circumstances [grievant's supervisor] suddenly discovered in August that Grievant had made this alleged comment . . . ." *Id.* at 115. Because of the lack of an explanation, the Board concluded that the supervisor solicited the complaint to penalize grievant for his grievance activity. *Id.* In fact, the supervisor testified that the complaint came to light from the unsolicited comment of another employee of the audited company, and he acted on it promptly after receiving the information. Because the Board's conclusion is based on a clearly erroneous finding, it cannot stand. We must reverse its decision to strike the reprimand and remand for further analysis by the Board.

The Board found that the State failed to meet its burden with respect to the termination. This conclusion is supported by the fact that two of the grounds for the dismissal could not be used. The Board also concluded that the ultimate reason for termination stated in the letter was not supported by the evidence. The letter stated that grievant's actions had convinced AOT "that you can not be trusted to conduct objective and unbiased audits on its behalf." The Board found no evidence that bias in conducting audits was an issue or that such a concern supported dismissal. Its conclusions are supported by its findings.

## V.

Finally, the State challenges the Board's alternative conclusion that the evidence presented by the State was insufficient to warrant grievant's dismissal. The State argues that this conclusion was beyond the Board's jurisdiction, as explained in a number of decisions of this Court. See, e.g., *In re Gorruso,* 150 Vt. 139, 145, 549 A.2d 631, 635 (1988). This conclusion was an alternative basis for the Board's

decision to reverse grievant's termination, and the basis for its decision to impose a thirty-day suspension. Because we have affirmed the decision on the primary ground asserted by the Board, we need not reach this alternative ground. Since the normal remedy for a discrimination decision is reinstatement and back pay, the suspension operates to the State's benefit and was not the subject of a cross-appeal by grievant.

*The decision of the Vermont Labor Relations Board in Docket No. 92-9 is reversed with respect to the September 6, 1991 written reprimand of grievant and remanded for proceedings consistent with this opinion; in all other respects, the Board's decision in that docket is affirmed. The decision of the Board in Docket No. 92-26 is affirmed.*