2004 VT 42

**Grievance of June ROSENBERG and Vermont State Colleges Faculty Federation, AFT, UPV, Local 3180, AFL-CIO v. VERMONT STATE COLLEGES**

[852 A.2d 599]

No. 02-524

¶ 1. May 5, 2004. Defendant Vermont State Colleges (VSC) appeals from a decision of the Vermont Labor Relations Board concluding that VSC unlawfully retaliated against grievant June Rosenberg by not adjusting the spring 2002 course schedule at Lyndon State College to accommodate Rosenberg's scheduling preferences. We reverse.

¶ 2. Rosenberg has worked as a part-time faculty member of the Lyndon State College (LSC) Psychology Department since 1993. She belongs to the VSC Faculty Federation, the collective bargaining unit that represents faculty members in the state college system. Her grievance against the college involves course scheduling and teaching assignments. Scheduling and assignment decisions at VSC are guided by provisions of the union contract. Assignments for part-time faculty like Rosenberg are made on a semester or summer basis by administrators at each college in the system. Spring semester assignments are made during the fall, and fall assignments are settled in mid-summer. The contract requires the college to consider faculty preferences when developing semester schedules and teaching assignments. To do so for part-time faculty, the college distributes a form on which part-time

faculty members must state their availability to teach and may indicate their preferred teaching schedule. The form must be distributed by April 1 for the fall semester and October 15 for the following spring semester. The teaching preference form notwithstanding, the school retains discretion under the contract to assign part-time faculty to a schedule that does not meet the faculty member's preferences. The school is contractually bound to give priority to full-time faculty and administrators over the preferences of part-time faculty, and assignments for part-time faculty are made on a seniority basis. The contract allows the school to deviate from contract assignment procedures in extraordinary circumstances, or when the school finds an individual with exceptional qualifications or expertise to teach.

¶ 3. In addition to accounting for faculty preferences and schedules, each college must consider the educational needs of its student body. Doing so requires taking into account the skills and expertise of each faculty member. An additional consideration is balancing the needs of day-time students and those of nontraditional students who work during the day. To meet the needs of both categories of students, LSC generally schedules day-time classes to meet two or three times per week, while evening classes are offered once a week for longer time periods.

¶ 4. For the 2001-2002 academic year, LSC's academic dean established additional guidelines for course scheduling. First, to increase the number of day-time classes available to traditional students, the dean asked faculty to spread day classes out over multiple periods during the week. Second, the dean asked that evening classes begin no earlier than 5:30 p.m. to make it more convenient for nontraditional students to attend.

¶ 5. This case arose from the schedule LSC developed for the spring 2002 semester. In any given semester, the Psychology Department at LSC has to schedule four to six full-time faculty members and four to seven part-time faculty members. The Board found that the Department began working on the spring 2002 schedule in the first week of September 2001. During the last week of September, the Department's co-chair, Ronald Rossi, discussed the tentative spring schedule with Rosenberg. Rossi, also a union member, was responsible for coordinating department faculty teaching requests and preferences. In their conversation, Rossi told Rosenberg that the tentative schedule accounted for the new academic guidelines the dean issued for the 2001-2002 academic year. The tentative schedule assigned Rosenberg to teach two sections of an introductory psychology course, one section meeting on Wednesday evenings from 5:30 p.m. to 8:10 p.m. and the other on Mondays, Wednesdays, and Fridays from 9:00 a.m. to 9:55 a.m. In previous semesters, Rosenberg was scheduled to teach two classes on Wednesday afternoons back to back, a schedule she preferred because of her commute from home.

¶ 6. Consistent with her earlier position, Rosenberg objected to the schedule saying she wanted to continue the Wednesday-only teaching assignment because of commuting and child-care considerations. Rossi told Rosenberg about the next Psychology Department meeting and said that he would raise her concerns about the proposed schedule there. Rossi did so. Rosenberg did not attend the meeting, and the Department chose not to alter the tentative schedule. In early October, Rosenberg submitted her availability form to the Department, stating that she would prefer to teach "Wednesday all day into evening." She also wrote: "If I could teach three courses I would be willing to be on campus 2 days. Otherwise the present schedule is preferable." She did not indicate that she had any other commitments preventing her from teaching any par-

ticular day of week or time of day. On October 16, Rossi offered Rosenberg the schedule at issue in this appeal. Although Rosenberg accepted the assignment, she filed a grievance claiming the school violated her contractual rights when it designed the spring 2002 schedule.

¶ 7. Rosenberg pursued her complaint about the schedule to the Vermont Labor Relations Board. Rosenberg's main complaint alleged procedural violations of the contractual provisions governing part-time faculty assignments. She also alleged that VSC violated the anti-retaliation provision of the contract by offering a spring 2002 teaching assignment that did not accommodate her preferred teaching times and resulting in significant inconvenience to her. She pointed to the disparate treatment she received in comparison to other faculty members whose preferences were accommodated as proof of retaliatory conduct. According to Rosenberg, the school dismissed her scheduling preferences to retaliate for an earlier grievance she filed after not receiving a teaching assignment for the summer of 2001 while a less senior faculty member had. Other than the fact of the grievance, and that Rossi told her seniority did not apply to summer assignments, the record contains little information about the circumstances of the earlier grievance. Rosenberg acknowledged that she taught during that summer despite the initial nonassignment, and that no faculty member spoke to her about the grievance.

¶ 8. In a split decision following the Board's evidentiary hearing, the Board agreed with Rosenberg's claims in part. The Board found no procedural violation of the contract, noting that Rosenberg was assigned the minimum number of credits available to part-time faculty under the contract for the spring 2002 semester. Although the Board found that VSC would not have given Rosenberg the schedule she wanted even if she had not filed a grievance about the summer 2001 semester, it concluded that

> it does not follow ... that the Employer would have given Rosenberg the identical schedule it did give her even if she had not pursued her grievance. It is striking to us that no accommodations were made to Rosenberg's preferences. The Employer has not presented persuasive evidence that some adjustments could not have been made to Rosenberg's schedule, either through time changes or a reduction in the amount of days she needed to be on campus, to make her schedule more convenient.

To find a contractual violation from the school's treatment of Rosenberg's preferences, the Board had to determine that the school was motivated by some impermissible factor, such as Rosenberg's earlier grievance. Noting that the school had accommodated the preferences of two other faculty members but not Rosenberg, as well as the fact that the decision on the spring 2002 semester came after her grievance about the summer assignment, the Board found that VSC was unlawfully motivated by the prior grievance. The dissenting Board member, Acting Chair Park, concluded that Rosenberg's dissatisfaction with the spring schedule was not a legitimate grievance under the contract. This appeal followed.

¶ 9. We begin with our standard of review of Labor Relations Board orders. We accord the Board's decisions substantial deference in recognition of its expertise. *In re Hurlburt*, 2003 VT 2, ¶ 18, 175 Vt. 40, 820 A.2d 186; *In re Butler*, 166 Vt. 423, 425, 697 A.2d 659, 661 (1997). The Board's findings will withstand appellate review if they are supported by more than a mere scintilla of evidence and are not clearly erroneous. *In re Merrill*, 151

Vt. 270, 275, 559 A.2d 651, 654 (1988). We will not disturb the Board's legal conclusions if the findings support them. *In re McCort*, 162 Vt. 481, 493-94, 650 A.2d 504, 512 (1994).

¶ 10. VSC challenges the Board's decision on several grounds, but we confine ourselves to the lack of evidence supporting the Board's finding of unlawful motivation. In cases like the present involving a complaint of discriminatory treatment for engaging in a protected activity, we have used the analytical framework set out in *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274 (1977). See *In re McCort*, 162 Vt. at 490, 650 A.2d at 509. The aggrieved employee must show that her protected activity was a motivating factor in the employment decision at issue. *Mt. Healthy*, 429 U.S. at 287; *McCort*, 162 Vt. at 490, 650 A.2d at 509. If the employee makes that showing, the burden of persuasion shifts to the employer, who must persuade the fact finder that it would have made the same decision even in the absence of the employee's protected conduct. *Mt. Healthy*, 429 U.S. at 287; *McCort*, 162 Vt. at 490, 650 A.2d at 509-10.

¶ 11. An employer's unlawful motive may be inferred from the circumstances where no direct evidence of the employer's intent exists in the record. *Kelley v. Day Care Ctr., Inc.*, 141 Vt. 608, 613, 451 A.2d 1106, 1108 (1982). There is no dispute that this case does not involve direct evidence of retaliation: the employer's representatives never mentioned the grievance in any of their interactions with Rosenberg. Thus, the Board had to weigh several factors in its determination, including whether the employer knew about the employee's activities, whether a climate of coercion existed at the workplace, and whether there was reason to find suspect the timing of the adverse employment decision at issue. *McCort*, 162 Vt. at 494, 650 A.2d at 512; *Ohland v. Dubay*, 133 Vt. 300, 302-03, 336 A.2d 203, 205 (1975). In accordance with its precedents, the Board also considered whether Rosenberg was treated differently from other faculty members. See *In re Sypher*, 5 V.L.R.B. 102, 131 (1982). Applying those factors, the Board determined that VSC knew about Rosenberg's previous grievance, but that no climate of coercion existed. On the issue of timing, the Board found it suspicious because the decision came "immediately" after the grievance about the summer assignment. It also found that Rosenberg was treated less favorably than two of her colleagues in terms of considering her scheduling preferences. For those reasons, the Board ultimately found that Rosenberg's complaint about the summer 2001 schedule motivated VSC's refusal to accommodate her preferences for teaching in the spring of 2002.

¶ 12. The Board found the timing of VSC's decision at issue here suspicious, but the evidence of record does not support such an inference. We note that, in general, an adverse employment decision following a successful grievance is not legally suspicious on its own. See *Roberts v. Broski*, 186 F.3d 990, 995 (7th Cir. 1999) (chronological relationship between employee's speech and discharge alone does not give rise to inference that activity motivated employment decision); *Hughes v. Bedsole*, 48 F.3d 1376, 1388 (4th Cir. 1995) (temporal connection between employment decision and employee's protected activity without more does not create jury issue that decision had discriminatory motive). Moreover, the longer the time period between the adverse decision and the protected activity the more attenuated causation becomes. In such cases, there must be some facts other than chronology alone to suggest that the timing of the employer's decision was suspicious. See *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 47, 176 Vt. 356, 848 A.2d 310 (in statutory retaliation case Court upheld summary judgment for employer where claimant did not present any evidence except for

timing of adverse decision, which came seven months after lawsuit and one year after original complaint). Even in our cases where the retaliatory conduct closely followed the protected activity, we noted that other evidence of improper motive supported the Board's finding of suspicious timing. For example, in *McCort*, we noted that in addition to coming one day after the employee's protected activity, the adverse decision lacked a reasonable basis. *McCort*, 162 Vt. at 495, 650 A.2d at 512-13. In *In re Southwestern Vermont Education Ass'n* we affirmed the Board's finding of unlawful retaliation where all of the *Ohland* factors were established by the evidence, including suspicious timing of the adverse decision. 136 Vt. 490, 493, 396 A.2d 123, 124-25 (1978). In that case, the timing was suspect because the adverse decision quickly followed the union's effort to obtain recognition. *Id.*; see also *Kelley*, 141 Vt. at 614, 451 A.2d at 1109 (evidence of retaliation sufficient where climate of coercion existed and timing was suspicious because adverse decision came four days before implementation of new work rules the employer advocated); cf. *Murray v. St. Michael's College*, 164 Vt. 205, 212, 667 A.2d 294, 300 (1995) (employee's claim of discrimination for filing workers' compensation claim survives summary judgment where timing of discipline is suspect in that it shortly followed the decision to allow the claim and employee's supervisor expressed anger and frustration over the claim); *Gallipo v. City of Rutland*, 163 Vt. 83, 93, 656 A.2d 635, 642 (1994) (causation for purposes of discrimination claim may be shown by suspicious timing; although seven months elapsed between protected activity and discipline action complained of, suspicious timing was shown by the immediate assignment to more menial work and receipt of reprimand letters).

¶ 13. Because this case lacks direct evidence of retaliatory motive and requires inferences to be drawn from the circumstances, the fact finder needs sufficient details of the circumstances to be able to draw those inferences. If the grievant alleges her union activity motivated the decision and relies on the decision's timing, sufficient evidence of the grievance and its chronology must be introduced to support the claim and meet her burden of persuasion. See *McCort*, 162 Vt. at 494, 650 A.2d at 512 (grievant must "prove that his conduct was a substantial or motivating factor in the employer's actions"). In this case, and in contrast to those cited above, the record is virtually silent on the facts and circumstances of Rosenberg's protected activity, that is, the filing of the previous grievance. The record contains little evidence on the timing of the grievance because Rosenberg presented no details about it, such as the date she filed the grievance or when it was resolved. The record is silent on what process was used to dispose of the grievance, which school officials were involved in it, and why Rosenberg prevailed. All Rosenberg presented to the Board was that in February 2001 she learned another part-time faculty member with less seniority than she received a summer appointment when she had not. She testified that Rossi told her that seniority did not apply to the summer sessions and noted that she grieved her "non-assignment." Finally, when asked what the outcome of the grievance was, Rosenberg testified that "[t]he bottom line was that I taught three credits of human development during summer session one."

¶ 14. That evidence alone is not enough to support the Board's inference that the timing of the spring 2002 scheduling decision was suspicious. If the grievance was filed shortly after Rosenberg learned of the summer work assignment, and resolved informally shortly thereafter, approximately eight months came between the protected activity and the adverse decision that is the subject of this grievance. More importantly, the

Board could not find, on this sparse evidence, that the spring assignments represented the first opportunity to retaliate against her. As the facts disclose, Rosenberg did not have to apply for course assignments for the fall until April, and the assignments were made after that. She received exactly the fall course assignments she requested; that is, no retaliatory inconvenient course assignments were made at that first opportunity. Under these circumstances, and absent other evidence, the Board could not conclude, as it did, that the inconvenient course assignments "immediately" followed her successful pursuit of a grievance, and that the timing of the inconvenient course assignments was suspicious in relation to the earlier grievance. See, e.g., *Robertson*, 2004 VT 15, at ¶ 47 (adverse decision coming one year after original complaint and seven months after lawsuit not enough to suggest unlawful motive).

¶ 15. We emphasize that our role is to ensure that the Board's findings have support in the evidence, and if the grievance at issue here were placed in context, the evidence may have supported the Board's finding. The problem is that Rosenberg offered no such evidence, and the Board had no basis from which to infer suspicious timing. Considering that Rosenberg's retaliation claim centered on a prior grievance, it was incumbent upon her to present the Board with some contextual evidence about the grievance to show that the decision was suspiciously timed and, in turn, unlawfully motivated.

¶ 16. In the absence of suspicious timing, there was no basis for the Board to infer unlawful motive from the disparate treatment Rosenberg received when the spring 2002 schedule was developed. Accordingly, it could not conclude that Rosenberg met her burden at the first step of the *Mt. Healthy* analysis.

¶ 17. The parties have raised other arguments in favor of their positions. We do not need to address them in light of our disposition, and we therefore decline to do so.

*Reversed.*