## In re Grievance of Deborah Butler

[697 A.2d 659]

No. 95-044

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed May 23, 1997

424

*Samuel C. Palmisano*, VSEA Legal Counsel, Montpelier, for Appellee Deborah Butler.

*Jeffrey L. Amestoy*, Attorney General, and *David K. Herlihy*, Assistant Attorney General, Montpelier, for Appellant State of Vermont Department of Public Safety.

**Morse, J.** The State appeals a decision of the Vermont Labor Relations Board holding that the Department of Public Safety discriminated against grievant Deborah Butler on the basis of her gender, and ordering her reinstatement as a Vermont State Police officer. Butler had been dismissed because she did not successfully complete her probationary period of employment. The Board concluded that had she not been treated differently because of her sex, Butler would have become a permanent state trooper. We affirm the decision of the Board.

We emphasize at the outset the limited nature of our review. The Board's decision is entitled to substantial deference. *In re Towle*, 164 Vt. 145, 148, 665 A.2d 55, 58 (1995). We will not reverse its conclusions where the findings of fact, taken as whole, support them, *In re VSEA*, 164 Vt. 214, 216, 666 A.2d 1182, 1183 (1995), nor disturb its findings unless they are clearly erroneous. *In re Merrill*, 157 Vt. 150, 154, 596 A.2d 345, 348 (1991). Even if there is substantial evidence contrary to a challenged finding, it will stand if there is credible evidence to support it. *In re Brooks*, 135 Vt. 563, 567, 382 A.2d 204, 207 (1977). In sum, we will not overturn a Board decision merely because we would not have reached the same decision had we been on the Board. *International Ass'n of Fire-Fighters v. Town of Hartford*, 146 Vt. 371, 374, 503 A.2d 1143, 1145 (1985).

The record discloses the following pertinent facts. In August 1991, Butler accepted a position with the Department as a Vermont State Police officer. Following a brief training course at the Vermont Police Academy and a temporary assignment to Waterbury, Butler was directed to return to the Academy for a full three-month training session. She was one of three women out of twenty-four participants, and the only female state police officer. It was during this training period that Butler first experienced treatment that made her feel uncomfortable as a woman in a male-dominated profession. The director asked her for her "opinion" about another female trooper whose earlier sex discrimination grievance had been dismissed by the

Board, which she took as a warning against filing a similar complaint. Several male troopers also taunted her with comments that they had better "watch out" or she would charge them with sexual harassment. From these and other experiences the Board concluded that Butler's supervisors and colleagues sent "a powerful message very early in [her] tenure to not raise complaints because of her gender if she wished to fit into the law enforcement profession." Butler was also the target of a number of lewd and sexually suggestive remarks from a male officer in training, Mark Lucas. On one occasion, he grabbed his crotch in front of her and told her to "suck on this." On another, he attacked her kick-boxer fashion and ridiculed her when she protested, stating, "[I]f you can't take it in here, you're not going to take it in the streets."

After the three-month training course, both Butler and Lucas were assigned to the St. Albans Police Barracks to begin the mandatory six-month probationary period. Butler was the only full-time woman officer in the barracks. Over the ensuing months, Butler experienced numerous incidents which, the Board found, evidenced an atmosphere in the barracks that was sexist, demeaning, and hostile to women. For example, pictures of semi-nude women were openly displayed, an officer told his girlfriend that Butler was his "sex slave," and St. Albans personnel, including Butler's supervisors, repeatedly discussed her reported marital difficulties and interfered in her personal relationship with a former state police officer. A supervisor eventually informed Butler that her relationship with the former trooper was antagonizing her colleagues and was "tarnishing the green and gold." The Board found that such singular conduct "had the effect of . . . making [Butler] an object of ridicule" among her fellow officers and "contributed to an intimidating and offensive work environment . . . based on her gender."

In September 1992, Butler received her first performance evaluation. Her point total of 272 (based upon numerical ratings in various performance categories) placed her within the range of a rating of "3" (i.e., "consistently meets job requirements/standards"). Nevertheless, her overall evaluation for the probationary period was a "2" (i.e., "inconsistently meets job requirements/standards") because of negative remarks in the narrative portion of her evaluation. These remarks included recommendations that Butler "become more aware of [her] surroundings," "take a more defensive posture when dealing with the unknown," "become more aggressive," and develop a "more rigid mindset." The evaluation noted that Butler had filed seventeen

late reports. Butler's colleague, Lucas, had earned 296 performance points and an overall evaluation of "3." His supervisor praised Lucas's "aggressive approach." Based upon their respective performance evaluations, Lucas was informed that he had successfully completed his probationary period, while Butler's probation was extended an additional six months.

During the extended probationary period, a colleague told Butler that it was his birthday and solicited a kiss. When she refused, he derided her appearance, stating that she was several "ax handles wide." Another trooper cursed at her across the barracks allegedly because she was taking a personal telephone call, although this was common practice among the officers. Although Butler later reported several such incidents to her supervisor, he failed to respond. At the conclusion of the extended probationary period, Butler again received an overall rating of "2." This time her supervisors recommended that she be dismissed, citing deficiencies in several areas. Butler, in response, consulted with counsel and set forth her allegations of sexual harassment in a meeting with the Commissioner of Public Safety and state police officials. Following an investigation, the Commissioner informed Butler that the commander of the St. Albans barracks was unwilling to take her back, but that the Middlebury barracks had expressed an interest in her transfer there. The Commissioner assured her that Middlebury "could provide a good opportunity for [Butler] to succeed because it had assimilated women into the barracks" and had a "progressive manager."

Butler, who lived in St. Albans with her three children, was in the process of obtaining a divorce and was told by her attorney that a move could adversely affect her obtaining custody of the children. Accordingly, she informed the Commissioner that she could not transfer to Middlebury. A temporary transfer to the Williston barracks was arranged, and Butler's probation was extended another seven months. At the Williston barracks Butler's overall performance was rated as good in several areas and overall as satisfactory. When she failed to report to Middlebury as ordered, however, her employment was terminated.

She filed two grievances, which were consolidated for hearing and decision by the Board. Butler alleged that her adverse performance evaluation, transfer, and dismissal were the result of discrimination on account of her sex, in violation of 3 V.S.A. §§ 312(b)(5) and 1001 and the collective bargaining agreement. She pursued her discrimination claims under both hostile-work-environment and disparate-

treatment theories. Following a hearing, the Board issued a lengthy opinion (in excess of 100 pages) holding in favor of Butler, and ordering her reinstatement as a tenured officer and reimbursement of back pay and benefits. Based upon an exhaustive review of the record and extensive findings of fact, the Board concluded the Department had maintained a work environment hostile to women, and — consistent with that environment — Butler's performance evaluation, transfer, and dismissal were the result of intentional sex discrimination. The Board concluded that Butler was held to a different and higher standard than male officers, and that except for this discriminatory treatment she would have received an overall satisfactory performance evaluation, would have become a permanent state trooper, and would not have been forced to choose between a transfer or dismissal. It therefore ordered her reinstatement as a permanent state trooper, with full back pay and benefits. This appeal followed.

■ The State first attempts to undermine the Board's conclusion that Butler was subjected to a "hostile environment." *Allen v. Department of Employment & Training*, 159 Vt. 286, 290, 618 A.2d 1317, 1319 (1992); see *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (workplace "permeated with 'discriminatory intimidation, ridicule, and insult'" constitutes abusive working environment) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986)). Although not controlling, federal decisions dealing with hostile environment claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, provide useful analytical guides. See *Lavalley v. E.B. & A.C. Whiting Co.*, 166 Vt. 205, 210, 692 A.2d 367, 369 (1997); *Graff v. Eaton*, 157 Vt. 321, 324, 598 A.2d 1383, 1384 (1991).

■ We note, at the threshold, that Butler was not required to establish a hostile environment claim per se. Her claim for relief centered on being treated differently and ultimately on being forced out of the Vermont State Police because she was a woman. The environment in which she worked, and the attitude of her colleagues and supervisors towards her as a woman, were relevant to establishing whether she was judged differently and more harshly than her male colleagues. As the Board noted, we cannot divorce the environment from the inappropriate conduct; the claim of a hostile environment is inextricably linked with the claim of disparate treatment.

■ The State contends the Board's conclusion that Butler was subjected to such an environment is flawed because it was based in part upon certain incidents that occurred at the Vermont Police

Academy, a statutorily separate body administered by the Criminal Justice Training Council and not controlled by the Department. The distinction is not as clear as the State avers. Training at the Academy is mandated by law for all state police officers. 20 V.S.A. § 2358. The Commissioner of Public Safety not only sits on the Council, but is statutorily obligated to develop and conduct training programs for the Academy. "Basic training programs for Vermont state police officers, including curriculum, location, duration, and selection of instructors and other personnel, shall be developed and conducted by the commissioner of public safety . . . ." 20 V.S.A. § 2364. The plenary control that the Department thus exercises over the training program may be, depending on the claim and the circumstances, sufficient to hold it liable for the incidents that occurred at the Academy. See *Allen*, 159 Vt. at 291, 618 A.2d at 1320. Butler's Academy experience did not, however, play a large role in the Board's decision. It was cited primarily to explain her subsequent reluctance to complain of the sexual harassment she endured in the barracks. Thus, the Board's conclusion would not be undermined even without consideration of the Academy incidents.

■ The State also asserts the Board erred in considering certain evidence the State characterizes as "gender-neutral." The evidence included frequent comments to Butler by male officers that they should be careful around her or she would report them for sexual harassment, vulgar and derogatory remarks about her appearance, cursing at her, comments about her personal relationships, and an incident in which Officer Lucas demonstrated his kick-boxing skills by assaulting her and warning, "[I]f you can't take it in here, you're not going to take it in the streets." To demonstrate a hostile environment the conduct need not be of an explicitly sexual nature so long as it is directed against women *because* of their sex. *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994). Although the State dismisses many of the challenged remarks as mere "trooper room banter" and notes that Lucas also kicked male officers, the incidents in question went further; they were directed at or about Butler — her sensitivity to discrimination, her sex life, her personal relationships, her physical "toughness" — precisely because she was a woman in a male-dominated environment. "[T]he pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir. 1990).

■ Similarly, the State contends the Board erred in considering as evidence of a hostile environment a poster in the barracks of a woman in a skimpy bikini and a photograph of a woman wearing only a bikini bottom. These "benign" pictures, the State argues, fall short of the kind of hard pornography necessary to demonstrate a hostile environment. The law does not establish a minimal level of tastelessness for material to be relevant to a discrimination claim. On the contrary, the posting or display of any sexually oriented materials in common areas that tend to denigrate or depict women as sexual objects may serve as evidence of a hostile environment. *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 879-80 (D. Minn. 1993). The Board properly relied on the pictures in assessing whether Butler labored in an environment hostile toward women.

■ The State also contends the Board erred in considering several derogatory comments about Butler that she did not witness but were later reported to her during her employment. Even if the statements were not made in Butler's presence, they are relevant to the issue of on-the-job harassment as further evidence of an atmosphere of discrimination. *Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995).

■ The State further contends the findings are insufficient to support the Board's ultimate conclusion that Butler faced a hostile work environment. Viewed in the light of the record as a whole, *Meritor*, 477 U.S. at 69, we are satisfied that the findings support the Board's conclusion. This is not a case of outright and blatant discrimination based on gender; hostile environment cases seldom are. They are based, as this case demonstrates, upon the accretion of seemingly small incidents — of being criticized more harshly, scrutinized more closely, ridiculed for lack of aggression, or diminished for one's appearance, that in the aggregate create an environment of hostility and discrimination. It is revealing, in our view, that notwithstanding Butler's less than satisfactory evaluation in St. Albans, the Commissioner judged that rather than a dismissal, a transfer to Middlebury, a barracks with a more "progressive" manager that had already "assimilated" women, was warranted. His observation that Butler would have a good opportunity to succeed in such an environment was tacit acknowledgment that her difficulties in St. Albans lay largely in the attitudes of her supervisors and colleagues toward women, and not in herself.

Finally, the State contends the Board's disparate treatment analysis — the core of the dispute — was flawed by comparing Butler's

conduct to persons and conduct that were not similarly situated. To establish a disparate treatment claim, "it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 258 (1981); see also *Hodgdon v. Mt. Mansfield Co.*, 160 Vt. 150, 159, 624 A.2d 1122, 1127 (1992). The United States Supreme Court has noted that in comparing employment discipline decisions, "precise equivalence in culpability between employees" is not required. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976). Rather, the plaintiff must show that the employees were engaged in misconduct of "comparable seriousness." *Id.* "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989).

█ The Board compared Butler's reported deficiencies to several incidents involving Trooper Lucas while both were on probation. These included: Lucas abusing his authority by threatening to cite a woman on behalf of his roommate's parents; calling in sick to work during an evening shift because he had been drinking the night before; and submitting inadequate reports. The State argues that the first and second incidents, unlike Butler's deficiencies, were not performance related and were dissimilar from any of Butler's alleged shortcomings. Although this may be true, we are inclined to agree with the Board that they "constitute more serious deficiencies" than Butler's. In any event, "precise equivalence" is not required. *McDonald*, 427 U.S. at 283 n.11. The State further notes that the incident involving Lucas's use of alcohol occurred after he had passed probation. Had Lucas been a seasoned veteran at the time we might be inclined to agree that the comparison was questionable. In fact, however, he had attained tenured status within the year, and was thus in a "roughly" similar position. See *Dartmouth Review*, 889 F.2d at 19.

The State also challenges the Board's comparison of Butler to Trooper Todd Chisolm, who had been assigned to the St. Albans barracks since becoming a trooper approximately five years earlier. While on probation, Chisolm had followed a woman home while on duty to ask her on a date, and was involved in an incident with the Burlington police while intoxicated. Although he was suspended and his probation was extended, Chisolm — unlike Butler — was promoted to a tenured position. Again, although dissimilar from Butler's alleged performance deficiencies, these incidents are of comparable

or greater seriousness and thus provide a valid basis of comparison. The fact that Chisolm completed his probation several years before Butler does not significantly undermine the comparison. Lastly, although the State complains that the Board improperly limited Trooper Chisolm's testimony concerning the incidents in question, a review of the record reveals that he was afforded the opportunity to explain his conduct.

*Affirmed.*

**Allen, C.J.,** dissenting. I believe that the Vermont Labor Relations Board's (Board) determination that a hostile environment sufficient to support an inference of discrimination on the basis of sex existed was flawed.

First, its decision was based in part upon incidents that occurred at the Vermont Police Academy (Academy), a statutorily separate body administered by the Criminal Justice Training Council and not maintained or controlled by the Department of Public Safety (Department). The Board did not find that the Academy was authorized to act for the Department or that the Department exercised any control over the Academy. While it recognized that the Director of the Academy was not in the Department chain of command and was not grievant's supervisor, it nevertheless attributed his actions to the Department because they occurred during employer-mandated training. The proper inquiry should have been whether his acts were attributable to the Department under agency principles. See *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 72 (1986) (for employer liability, courts should look to agency principles for guidance). There is no finding or conclusion that would support a holding that an agency relationship sufficient to impute the Academy's acts or omissions to the Department existed. Nor does the suggestion in the majority opinion that the Department exercises "plenary control," see 166 Vt. at 429, 697 A.2d at 664, over the training program suffice to make it liable for the Academy incidents. The Commissioner of Public Safety is but one member of a twelve-member council that adopts rules respecting training, and conducts and administers training schools for all law enforcement officers. See 20 V.S.A. § 2355(a), (b). The requirement that the Commissioner develop and conduct training programs for state police officers, which must be approved by the council, see *id.* § 2364, does not create an agency relationship.

The majority then suggests that the Academy experience did not play a large role in the Board's decision and was cited only to explain

grievant's reluctance to complain. It is clear from the Board's findings and conclusions that the occurrences at the Academy entered into its determination that grievant was the victim of intentional sex discrimination. The Board stated that it was necessary to examine grievant's entire work history, including the incidents at her Academy training, and concluded from the other occurrences at the Academy that "inferences of discriminatory animus" had been raised.

The Board's inclusion of the Academy experience in reaching its conclusions was error for another reason. The Board opined that the employer could be held liable for co-worker harassment only where the employer provided no reasonable avenue for complaint, or the employer knew, or should have known, of the harassment and failed to take remedial action. A reasonable avenue for complaint existed. The Board found that the Department had a detailed sexual harassment policy with reporting procedures that required an employee believing himself or herself to be sexually harassed to immediately report the harassment to the immediate supervisor, or, if the complaint involved that supervisor, then to the supervisor's supervisor. It further provided that if the employee was uncomfortable about complaining through the chain of command he or she could complain to the Department's Personnel Officer, the Employee Assistance Coordinator, the Commissioner, or any member of the Employee Relations staff. The policy prohibited sexual harassment and did not suffer from the reporting deficiency found in *Meritor*. See *Meritor*, 477 U.S. at 73 (bank's grievance procedure required employee to complain first to her supervisor, employee's alleged perpetrator). The Board simply excused grievant's failure to avail herself of the procedures designed to eliminate harassment because she had received "a powerful message" from the Director of the Academy not to complain. The Board was thus able to avoid deciding what consequences should result from the failure to follow the reporting requirements. Such failure should weigh heavily against imposing liability on the Department. See *Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 776 (6th Cir. 1996) (grievant's failure to avail herself of company policy for reporting harassment weighs strongly against imposing liability on company). Grievant should not have been relieved of the reporting requirements because of the remarks of the Director at the Academy.

Second, while the Board recognizes that different rules apply where the hostile environment is created by supervisors as opposed to co-workers, there is no analysis of their proper application in this case. The Department is held liable for the actions of the sergeant and

the lieutenant because they were using their supervisory authority to further the alleged harassment. Their own harassment, however, consisted only of disparaging remarks concerning grievant's relationship with a former trooper, which can hardly be equated with a workplace permeated with such "'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive'" to change the conditions of the grievant's employment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor*, 477 U.S. at 65, 67). How this criticism of grievant's relationship with a former trooper could be found to be a use of supervisory authority to further the alleged harassment is not explained. See *Karibian v. Columbia Univ.*, 14 F.3d 773, 780 (2d Cir.) (knowledge of "low-level supervisor" is not imputed to employer where supervisor does not rely on supervisory authority to carry out harassment), *cert. denied*, 512 U.S. 1213 (1994). Furthermore, the sergeant's knowledge of co-worker harassment consisted of grievant's complaint about being asked for a kiss by "one of the guys" and the comment about her size. The lieutenant had no knowledge of co-worker harassment. The Board assumes the knowledge of the sergeant to be the knowledge of the Department without discussion. For the knowledge of a supervisor to be imputed to the employer, the supervisor must be "at a sufficiently high level in the hierarchy" of the employer. *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 64 (2d Cir. 1992). The Board did not find or conclude that the lieutenant or sergeant was of a sufficiently high level to impute knowledge to the Department. In fact, the only relevant finding of the Board lists the lieutenant and sergeant last in the chain of command.

Because the claim of hostile environment was improperly attributed to the Department and, as the Board found, was "inextricably intertwined" with the claim of disparate treatment, I would reverse.