2004 VT 50

## Mary Lee McIsaac v. University of Vermont

[853 A.2d 77]

No. 03-241

Present: Amestoy, C.J., Dooley, Skoglund and Reiber, JJ., and Zimmerman, D.J., Specially Assigned

Opinion Filed June 4, 2004

*Edwin L. Hobson*, Burlington, for Plaintiff-Appellant.

*Jeffrey J. Nolan* of *Dinse, Knapp & McAndrew, P.C.*, Burlington, for Defendant-Appellee.

¶ 1. **Dooley, J.** Grievant Mary Lee McIsaac appeals an opinion and order of the Vermont Labor Relations Board (Board) which found that the University of Vermont (UVM) did not violate any rules or regulations when it denied her application for tenure. Grievant argues that the Board erred by: (1) incorrectly applying a mixed motive analysis to a sex discrimination claim; (2) failing to require UVM to follow its own procedures; and (3) failing to disqualify a member of the Board because he had previously served as a member and chair of the UVM Board of Trustees. We affirm.

¶ 2. The Board made the following findings of fact. Grievant was a faculty member in the history department at UVM from fall 1994 until spring 2001. She was a tenure-track assistant professor who was hired to teach East Asian history with a focus on China and Japan. Tenure-track professors at UVM are subject to three reviews. The first, done in the second year, includes a review done by both the department and the dean of the College of Arts and Sciences (dean). The second, conducted two years later, is considerably more extensive. It begins with a review by the department and then is followed by a review by the dean who receives advice from the College Faculty Standards Committee. The professor is then reviewed by the provost with the advice of the Senate Faculty Affairs Committee. The case is finally considered by the president who renders a final decision. The process for the third and final review is similar to the second review's; however, after the final review the professor is either granted tenure and promoted to the rank of associate professor or denied tenure and a further teaching contract. The final review, which can culminate in a life-time faculty appointment at UVM, is complex and multilayered with a thorough review at each level. At every level of consideration, written comments about the applicant are submitted, and the applicant either is or is not recommended for tenure. As the applicant's file proceeds through the process, the written comments from the previous levels are included.

¶ 3. During each review, the professor is evaluated in three areas: teaching, service and scholarship. In each review, including the final one, grievant received positive evaluations for teaching and service; it was clear that she was a valued teacher who made significant contributions to the UVM community. However, at every review the decision-makers expressed concerns about grievant's scholarship. Following her first review, the College Faculty Standards Committee, although unanimously recommending grievant for reappointment, wrote, "The committee is concerned about the apparent lack of scholarly projects as [grievant's] C.V. does not indicate any work in progress." The dean expressed similar concerns stating:

> [Grievant] should indeed continue to use her dissertation to form a substantial body of published work. However, in my view, it would be a mistake to publish her thesis research as both articles and as a book. She should decide which is best and proceed accordingly. The reason for this advice is that I believe in order to win a promotion and a permanent position at the University, faculty must demonstrate that their schol-

arly work is moving beyond the thesis. If too much time is spent in publishing both articles and a book drawn from the thesis there is little left over to demonstrate future promise which, in my view, is the most important consideration for promotion and tenure.

Grievant did not receive a copy of the dean's comments until eighteen months after they were written.

¶ 4. During the time between her first and second review, grievant was working on both articles and a book, and was giving conference presentations. She also had become involved in editorial activities for a newsletter that focused on Chinese urban history. As part of her second review, grievant submitted a curriculum vitae which listed her scholarly accomplishments following her first review. Included on the list were the following: an article to be published in a conference volume, an article submitted to *The American Historical Review* — the preeminent scholarly journal in grievant's field, and three submissions to the Chinese urban history newsletter.

¶ 5. The comments grievant received following her second review echoed those in the first. The College Faculty Standards Committee stated, "In the area of scholarship the Committee found [grievant's] record to be somewhat thin." The Committee went on to list grievant's scholarly accomplishments including the work she was doing towards publishing a book and concluded by stating, "The Committee recognizes the value of these projects and wishes to stress the importance of their coming to fruition by the time of consideration for tenure and promotion." In the same vein, the dean explained, "While [grievant's] work is promising indeed . . . it is important to point out that she needs to have her research accepted for publication either in the book that is currently underway or in a series of articles if she is to be successful in obtaining promotion and tenure in her next personnel action." Similarly, the Faculty Affairs Committee that advised the provost, who approved grievant's reappointment, stated, "[The Committee] strongly reiterates the dean's concerns regarding publication rate."

¶ 6. In the spring of 1998, grievant became pregnant. Consistent with UVM policies she requested a leave from her teaching duties in spring 1999 and a one-year extension of her tenure clock. Grievant's requests were granted, and her tenure review was set for the 2000-2001 academic year, rather than the 1999-2000 academic year. Grievant submitted her application for tenure in the fall of 2000. As part of

her final tenure dossier, grievant listed her scholarship to date. The list included two articles in peer reviewed journals, one introduction to a special issue of a journal, one newsletter article, one encyclopedia entry and one dictionary entry. She also listed a book manuscript as a work in progress that was being reviewed by two prestigious university presses.

¶ 7. Grievant's tenure review began at the department level. Each UVM department handles a candidate's tenure review in a slightly different manner. During grievant's tenure application period, the history department's review process was in flux. Prior to grievant's consideration, the chair of the department would appoint a two-person tenure review committee. The primary job of the committee was to solicit letters from outside evaluators regarding the candidate's scholarship. For grievant's review, because of problems in a prior candidate's evaluation, a two-person committee was not appointed; rather the chair of the department handled this responsibility. In addition to soliciting letters, the chair was also responsible for helping grievant compile her tenure dossier. Moreover, after departmental consideration was complete, it was the chair's responsibility to make a final tenure recommendation to the dean.

¶ 8. On October 30, 2000, the history department met to consider grievant's case. When considering a tenure case it is typical for department members to enter a written vote as to whether an applicant should receive tenure. In grievant's case, the department vote was split: eight voted for tenure, eight voted against. Those voting against grievant found her scholarly record thin and voted to deny tenure primarily on that basis. Of the eight faculty members voting against grievant, four made some reference in their written comments to the extension grievant received on her tenure clock for maternity reasons. After the faculty members voted, the chair was required to make a recommendation to the dean.

¶ 9. In her initial vote as a member of the department faculty, the chair concluded that grievant should be denied tenure because her scholarship did not meet the basis for tenure and promotion. After reconsideration and the faculty voting, the chair changed her conclusion and recommended grievant for tenure "with strong reservations." In her final recommendation, the chair described grievant's teaching as "clearly excellent" and found her service was "solid." With regard to her scholarship, the chair stated, "[Grievant's] *publication* record (as distinct from her *research* record) remains essentially the same as it was at her last reappointment review." The chair went on to describe

the book grievant had in progress and noted that while the readers at the two university presses were impressed with its quality, "extensive revisions" were suggested and grievant did not yet have a book contract. The chair also explained that the external reviewers asked to evaluate grievant's scholarship were uniformly positive in their assessments.

¶ 10. After the chair completed her evaluation and gathered the evaluations of her colleagues, grievant was given an opportunity to respond. In her response, grievant explained that some of her colleagues were inaccurate in their assessment of her scholarship. Grievant also responded that some of her colleagues had inappropriately raised and considered the one year extension on her tenure clock. Grievant accurately pointed out that the extension was not to be viewed as an "extra" year to research and write, and that she should not be penalized in any way for receiving the maternity extension. After grievant submitted her rebuttal statement, her file was forwarded to the College Faculty Standards Committee. As explained above, at each successive level of review the evaluation(s) and rebuttal statement from the prior levels' reviews are included in the applicant's tenure review file. Therefore, included in her file were the written votes from the history department, four of which made some reference to the extension grievant received on her tenure clock for maternity reasons, and grievant's rebuttal statement.

¶ 11. The College Faculty Standards Committee voted three to two in favor of granting grievant tenure and promotion to associate professor. The committee, although voting to grant tenure, expressed the reasons for the split decision:

> Those voting in favor believed that the quality of [grievant's] scholarship outweighed concerns about its appearance in print; those voting against found that her scholarly output did not meet the standards for tenure and promotion set out by her Department and the Dean of the College at her last appointment.

Grievant's file was then forwarded to the dean.

¶ 12. The dean voted against granting grievant tenure. The dean found grievant's teaching and service satisfactory for tenure, but determined that she had not met the requirements in scholarship. In a lengthy evaluation, the dean first described grievant's scholarship record to date explaining that although grievant had demonstrated

promise as a scholar, this promise had yet to materialize in print. The dean found grievant's failure to garner a book contract particularly troubling and noted that throughout her tenure review — at every level — there were significant reservations about her productivity as a scholar. The dean concluded by finding that grievant had not met the standards for tenure and promotion and stated, "[Grievant's] scholarly record simply does not meet the standards we expect."

¶ 13. In a footnote to her evaluation, the dean addressed grievant's concerns about her colleagues' statements indicating that they had considered her maternity extension in their evaluation. The dean explained:

> [Grievant] worries that the extension was used by some of her colleagues as a reason to ask for more than what is otherwise normally required. I agree this would have been inappropriate but do not believe that her colleagues were making this argument. [Grievant] should not be asked to do more because her tenure clock was stopped — what is the point of stopping the clock if that were the case — but neither can she be held to a lesser standard on the same grounds for which additional time had been offered and accepted. We have been very careful in the College of Arts and Sciences to make accommodations for the extra burden of maternity, but once that accommodation is made, maternity cannot be used as a reason for doing less.

¶ 14. Grievant's file was next considered by the Faculty Affairs Committee that voted eight to two against granting grievant tenure. All agreed that grievant's teaching and service were strong, but were split on her scholarship. The committee's statement accounted for the split explaining:

> Those voting in favor felt that the record of scholarship is sufficient to award tenure, citing in particular the extremely positive external review letters. Those voting against felt the candidate's current record of scholarship is insufficient for a positive tenure recommendation.

After consideration by the Faculty Affairs Committee, grievant's file was forwarded to the university's provost. Like those who had previously considered her file, the provost concluded that grievant's teaching and service met the university's standards for tenure, but found her record of scholarship inadequate. The provost, in addition to

evaluating grievant's scholarship record, explained that he had reviewed her rebuttal statement and stated, "[n]oteworthy were her comments about maternity leave and how its length and nature had been misinterpreted by certain faculty in her department. This issue was no factor whatever in my conclusion."

¶ 15. Following the provost's decision to deny her tenure and promotion, grievant appealed to the acting president of the university for a reversal. Grievant argued that both the dean and the provost denied her tenure because they relied on "inaccuracies and misunderstandings" that had occurred at the department level. The president denied grievant's appeal finding that both the dean and the provost had reached the conclusion that grievant's scholarship record was inadequate independently. That is, neither the dean nor the provost relied on the written votes that made reference to grievant's maternity extension in their decisions.

¶ 16. After the president denied her appeal, grievant filed a grievance with the Faculty Grievance Committee. In this grievance, grievant made nine complaints about the process used in the tenure decision. The committee unanimously sustained five of the nine complaints and recommended that grievant's tenure be reconsidered beginning at the department level. The president rejected the committee's recommendation and subsequent request for reconsideration. Grievant then appealed this decision to the Board.

¶ 17. In her grievance to the Board, grievant made the same nine allegations made to the Faculty Grievance Committee. They are: (1) as a result of antagonism over the procedures for selecting outside evaluation scholars, the history department chair abused her authority by presenting a case against tenure in violation of § 270.5 of the Officers' Handbook of the University of Vermont (Officers' Handbook); (2) the chair's conduct in undertaking to present grievant's case for tenure and secretly opposing it violated "even rudimentary standards of good faith and fair dealing" and denied "the peer review guaranteed by the UVM tenure procedure"; (3) the chair and part of the department faculty failed to apply the history department guidelines governing tenure evaluation with respect to scholarship, and the chair's standards represented a misreading of standards set by the dean at the second review; (4) in their votes, some faculty members penalized grievant for failure to publish during her maternity leave and thereby engaged in gender discrimination, violating Officers'

Handbook §§ 40.1, 40.2 & 270.5(c);[1] (5) although the chair was fully conversant with the peer review standards for the journals in which grievant had published, she failed to inform the department faculty of these standards and denied grievant the full benefit of her peer-reviewed publications; (6) the chair and others improperly considered the reports of anonymous readers of grievant's book manuscript to determine her scholarship and, therefore, denied her peer review of her scholarly achievements; (7) the chair, without a rational basis, stated that grievant's publication record at tenure review remained essentially as it was at the second review; (8) without rational basis, members of the faculty of the department stated that grievant's scholarship had not progressed adequately beyond her dissertation in violation of Officers' Handbook § 270.5; and (9) by issuing a nominally positive tenure recommendation although she actually opposed grievant's tenure application, the chair improperly reduced grievant's appeal rights, and her action abused the process and lacked a rational basis. The grievance complaint contains a summary that reiterated grievant's claim that the tenure review was "based on the discriminatory application of the rules," in violation of her rights, and that the denial of tenure was "an abuse of authority, . . . [without] a rational basis, and was discriminatory based on sex." The summary cited Officers' Handbook § 270.5 as the rule violated.

¶ 18. At the commencement of the hearing before the Board, grievant moved to recuse one of the members of the hearing panel, Edward Zuccaro, a former member and chair of the UVM Board of Trustees. The members of the panel unanimously denied the motion. Following a lengthy hearing, in which each side presented witnesses and documentary evidence, the Board dismissed all of grievant's claims finding that she had failed to prove that any university rule or regulation had been violated. The Board refused to consider claims raised for the first time in grievant's post-hearing brief because it found that grievant was required to raise all allegations in her initial filing. See *In re Whitney*, 168 Vt. 209, 215, 719 A.2d 875, 879 (1998).

---

[1] Grievant also charged that UVM had violated the Vermont Fair Employment Practices Act and the Vermont Parental and Family Leave Act. The Board ruled that it had no jurisdiction over such claims in a grievance proceeding. The grievant has not appealed this ruling so we do not consider these claims.

¶ 19. We start with the motion to disqualify member Zuccaro because it goes to the ability of the panel to take action.[2] Mr. Zuccaro sat on the UVM Board of Trustees from 1991 to 1997 and chaired the Board of Trustees from 1995-1996. Grievant objected to Mr. Zuccaro's presence on the Board hearing panel, but he was not disqualified. Grievant argues that the Board erred by failing to disqualify Mr. Zuccaro for three reasons: (1) because he sat on the Board of Trustees when grievant's first review from the dean, which she did not receive until eighteen months after it was written, was drafted; (2) while Mr. Zuccaro sat on the Board of Trustees he associated with the dean and the provost; and (3) as the only lawyer on the panel Mr. Zuccaro was in a position of particular authority.

¶ 20. In support of her reasons, grievant argues that this Court "applies the same standard for administrative tribunals as to judges." This assertion misstates the law and ignores our holding in *In re Crushed Rock, Inc.*, 150 Vt. 613, 623, 557 A.2d 84, 90 (1988), where we explicitly stated that "[w]hile the Legislature may choose to apply the Code of Judicial Conduct to those with adjudicatory powers in the executive branch, we find no indication that it has chosen to do so." See also *Sec'y, Agency of Natural Resources v. Upper Valley Reg'l Landfill Corp.*, 167 Vt. 228, 234, 705 A.2d 1001, 1005 (1997). The Legislature has not acted since *Crushed Rock* to apply the Code to administrative proceedings. Thus the Code provision on which grievant relied in support of her motion, which states that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned .... ," A.O. 10, Canon 3E(1), is inapplicable to this proceeding.

¶ 21. Grievant argues for the first time here that if the Code provision does not apply, Mr. Zuccaro must be disqualified under 12 V.S.A. § 61(a). Although grievant's precise argument under the section is unclear, we infer that she is arguing that Mr. Zuccaro acted in a "judicial capacity" when he was "interested in the event of such cause or matter" as those words are used in the section. In making this argument, grievant is relying upon *In re State Aid Highway, No. 1, Peru*, 133 Vt. 4, 9-10, 328 A.2d 667, 670 (1974), in which we held that § 61(a) applied to the chair of the environmental board, while she was

---

[2] UVM argues that even if Mr. Zuccaro should have been disqualified, this error is not grounds for reversal of the Board's decision because it was voted unanimously by the other members of the panel. In view of our disposition, we need not reach this argument.

presiding in a contested case, and required the chair's disqualification because she was a member of the board of an environmental organization which was participating as a party. UVM responds that we cannot consider this argument because it is raised for the first time on appeal, see *In re McMahon*, 136 Vt. 512, 514, 394 A.2d 1136, 1138 (1978); that the applicable standard is that imposed by due process of law as explained in *Crushed Rock* and *Upper Valley Regional Landfill Corp.*; and that if § 61(a) is applicable, it was not violated.

¶ 22. We do not have to decide the applicable standard, because under any standard, including that of the Code of Judicial Conduct, we conclude that the Board acted correctly. In reaching this decision, we emphasize that, as in judicial disqualification proceedings, the party making the motion has the burden to establish the grounds for recusal, see *State v. Putnam*, 164 Vt. 558, 563, 675 A.2d 422, 425 (1996), and the decision on the motion by the panel as a whole must be affirmed unless we find an abuse of discretion. See *id.* at 561, 675 A.2d at 424. The sparse record made by grievant does not establish an abuse of discretion.

¶ 23. The record here is comparable to that in *Gallipo v. City of Rutland*, 163 Vt. 83, 95-96, 656 A.2d 635, 643-44 (1994), in which the plaintiff in a Vermont Fair Employment Practices Act case attempted to disqualify the trial judge because he formally represented the City of Rutland during a period when the Rutland Fire Department implemented the employment policy that plaintiff alleged was illegally changed with respect to him. We held that the judge's former position was not "sufficient by itself to warrant disqualification." *Id.* at 96, 656 A.2d at 644; see also *Doyle v. Arlington County School Bd.*, 953 F.2d 100, 102-03 (4th Cir. 1992) (in special education case against school board, judge properly refused to recuse himself where he was a member of the school board when parents first applied for special education services, but not when the dispute giving rise to the suit arose). Although we did not discuss § 61(a) in rendering our decision, we conclude that the opinion was fully consistent with that section. The wording of the section addresses conflicts between the adjudication role and contemporaneous positions or interests, as was present in *State Aid Highway*, but not conflicts that arise out of past positions.[3]

---

[3] Grievant cited two cases involving zoning and municipal boards in support of her position that member Zuccaro had a conflict of interest. Both involve conflicts arising out of the property interests of the board member held at the time the member cast the vote being challenged. See *Clark v. City of Hermosa Beach*, 56 Cal. Rptr. 2d 223, 235 (Ct.

¶ 24. Here, Mr. Zuccaro had left the UVM Board of Trustees before grievant's tenure review process commenced, and, in any event, the Board of Trustees had no role in the tenure review process. Grievant argues that Mr. Zuccaro was a member of the Board of Trustees when she had her first review, and the history department chair improperly failed to provide her the dean's comments in the review.[4] We find this slight overlap between Mr. Zuccaro's UVM tenure and this proceeding to be negligible. He had no knowledge of the failure to forward the comments and had no responsibility in the process, and, in any event, no grievance resulted from the failure. Moreover, Mr. Zuccaro denied that he had more than a passing acquaintance with the academic decision-makers — the dean and provost —, and grievant failed to show any other connection between them. Mr. Zuccaro had no special status on the VLRB because he is a lawyer. The Board acted within its discretion to deny the motion to disqualify.

¶ 25. We turn now to the issues grievant raises with respect to the merits. Grievant raises four arguments on appeal: (1) the Board erred in not concluding that the tenure decision was based, in part, on gender discrimination; (2) the Board erred in not finding that UVM violated certain procedural rules in rendering its tenure decision; (3) the Board failed to consider claims for violation of procedural rules not contained in the grievance complaint; and (4) the Board failed to consider grievant's claim that the tenure decision was arbitrary and a violation of the implied covenant of good faith and fair dealing. Although grievant has not separately mentioned all her grievance counts in her statements of issues on appeal, the detail of her arguments return to virtually all of the grievance counts as well as other claims made for the first time later in the Board proceeding or in this Court. As a result, our review is organized somewhat differently from that presented by grievant.

¶ 26. When reviewing a decision by the Board, we presume it is valid and reasonable, *Vermont State Colls. Faculty Fed'n v. Vermont State Colls.*, 151 Vt. 457, 460, 561 A.2d 417, 419-20 (1989), and give the Board substantial deference. *In re Merrill*, 151 Vt. 270, 272, 559 A.2d

App. 1996); *Kovalik v. Planning & Zoning Comm'n*, 234 A.2d 838, 838-39 (Conn. 1967). Thus, they are similar to *State Aid Highway* and do not aid grievant's position.

[4] Grievant's complaint that the chair failed to provide her a copy of the dean's comments within a reasonable period of time was not raised in the grievance complaint and, thus, was not raised at the time of the recusal motion.

651, 652-53 (1988). Even if we would not have reached the same conclusion as the Board, we will uphold its findings if they are supported by credible evidence. *In re Butler*, 166 Vt. 423, 425, 697 A.2d 659, 661 (1997). Therefore, we will overturn a Board decision only if it is shown to be clearly erroneous. *Merrill*, 151 Vt. at 273, 559 A.2d at 653.

¶ 27. The grievance jurisdiction of the Board is limited. A grievance is a written expression of dissatisfaction with "aspects of employment or working conditions under collective bargaining agreement or the discriminatory application of a rule or regulation." 3 V.S.A. § 902(14). Where, as here, there is no applicable collective bargaining agreement, the only ground for a grievance is the discriminatory application of a rule or regulation. See *In re Gobin*, 158 Vt. 432, 434, 610 A.2d 150, 151 (1992). On this ground, failure of the employer to follow a binding rule constitutes an actionable grievance. *Id.*

¶ 28. The Board is empowered to adopt rules and regulations governing grievance proceedings. 3 V.S.A. §§ 926, 928. It has adopted a rule requiring the grievant to exhaust any administrative remedy available in the agency before filing the grievance with the Board. Vermont Labor Relations Board, Rules of Practice § 18.1. It has interpreted this rule to prohibit the employee from raising issues in the Board that were not raised in the prior administrative proceeding. See *In re Sklar*, 19 V.L.R.B. 183, 206-08 (1996). It has also required by rule that a grievance complaint make specific reference to the rule or regulation that is alleged to have been violated, Vermont Labor Relations Board, Rules of Practice § 18.3(D), and held that failure to do so is a waiver of reliance on the nonreferenced section. See *In re McCort*, 16 V.L.R.B. 70, 109 (1993).

¶ 29. The administrative process that grievant exhausted is similarly limited. That process is not the tenure review process about which grievant complains, but instead the Faculty Grievance Procedure set out in § 270 of the Officers' Handbook. Its purpose "is to provide a process for the fair and timely resolution of those claims based upon an event or condition which affects the terms and/or conditions of employment of a faculty member," but not to provide "an alternative locus of judgment as to a faculty member's academic qualifications or the wisdom (as opposed to the fairness) of a personnel decision." Officer's Handbook § 270.1. The grievance procedure establishes a grievance committee of seven persons to hear grievances, § 270.2b(1), but makes its action only a recommendation to the president who makes the final decision. *Id.* § 270.8. In this case, the

grievance procedure was invoked after the tenure decision was final to challenge the fairness of the tenure procedures. Because grievant was limited in the matter before the Board to the issues she raised in the faculty grievance procedure, the restrictions in the scope of the university grievance process necessarily applied in the Board process also.

¶ 30. To understand the appeal issues, it is helpful to summarize the rationales for the Board's decision. The Board actually rejected the claims raised in the grievance based on three overlapping, but independent, rationales. The first rationale is that the grievant failed to prove the claim on the merits. Most of grievant's claims were rejected on the merits although there was confusion about the standard the Board was to use in considering the merits, a confusion that has led to one of the main appeal issues. The confusion has arisen because of lack of clear definition of the rules UVM was alleged to have violated. Because the Board grievance was, in essence, an appeal from the president's rejection of the Faculty Grievance Committee decision, grievant expressed the grievance claims as she presented them to the grievance committee. The scope of review and jurisdiction of the Board and the Faculty Grievance Committee are not the same. The committee has jurisdiction over complaints alleging (1) "a violation of procedural rights ... [including] cases in which existing procedures were inadequate or inequitable"; (2) "a decision [that] had no rational basis or was the result of an abuse of authority"; and (3) "a violation of fundamental rights." Officers' Handbook § 270.5(a), (b) & (c). The Board, however, has jurisdiction only over claims of discriminatory application of a rule or regulation. Despite the narrower Board jurisdiction, grievant generally stated her claims in terms of the review standards of the committee — for example, whether a particular action of the history department chair had a rational basis or was an abuse of authority. For some of grievant's claims, the Board also analyzed and rejected the claim under the committee's review criteria. For others, it reviewed the claim under the applicable UVM rule or history department guideline establishing the substantive standards or procedures for tenure review.

¶ 31. The second rationale for the Board's decision was that certain claims grievant raised in her memorandum of law to the Board were not preserved in her grievance complaint as required by Board rule 18.3. Thus, the Board ruled that certain claims were waived because they were not itemized in the complaint: that the history department

chair violated Officers' Handbook § 231.2 in the way she conducted the faculty vote,[5] that all reviewers violated § 223.1 by not exercising "reasonable flexibility" in evaluating grievant's scholarship, and that UVM applied the tenure criteria in an "arbitrary manner."

¶ 32. The third rationale goes to the nucleus of the dispute between the parties as it evolved before the Board. Grievant's challenges to the procedures used in considering her tenure application related almost exclusively to the first step in the tenure process — the consideration of the application by the faculty of the history department and the recommendation that resulted from that consideration. The actual decision was made by the president after review by the dean and provost. Grievant presented her challenges to the history department procedures to these later decision-makers, and they stated that they reached their negative decision without being influenced by the challenged procedures in the history department. Thus, UVM's position in the Board and here is that the alleged procedural defects are now irrelevant because grievant would have been denied tenure even if the defects never occurred. Grievant's position is that the tenure process "is a cumulative one" so that later reviews can never purge errors in earlier reviews. The Board's primary rationale is the acceptance of UVM's position, although it didn't apply it to all of grievant's claims, as it could have. We note that this rationale was applied in *Nzomo v. Vermont State Colleges*, 138 Vt. 73, 76, 411 A.2d 1366, 1368 (1980) (*Nzomo* II), one of only two other faculty reappointment cases this Court has reviewed. As is apparent from our discussion of the appeal arguments below, and consistent with *Nzomo* II, we generally conclude that the Board acted within its discretion in accepting the UVM position on this rationale.

¶ 33. For some of UVM's claims, the Board appears to have employed all the rationales cumulatively. For others, it applied only one or two of the rationales. The use of alternative rationales complicates grievant's position on appeal. To prevail she must show that each of the alternatives is in error.

¶ 34. With this background in mind, we address grievant's appeal issues with respect to the Board's decision. Grievant first argues that the Board erred in not concluding that the tenure decision was based in part on gender discrimination because four of the adverse votes by

---

[5] There is reason to believe from the context that the Board meant § 231.1 and was responding to grievant's argument made for the first time in her post-hearing memorandum that the chair's failure for eighteen months to send her the dean's publication recommendations from her first review violated that rule.

history faculty members criticized grievant for not working on publication during her maternity leave. The Board's analysis of this claim relies upon the third rationale as described above. UVM's main response, without admitting that any of the faculty votes involved gender discrimination, was that the recommendations and decisions after the tenure case left the history department were independent and explicitly rejected reliance on nonpublication during grievant's maternity leave. UVM particularly relied upon the review by the dean, Joan Smith, and the provost, Robert Low. The Board found that the history department's review was based in part on gender discrimination, but accepted UVM's argument that the history department review became irrelevant because of the later reviews.

¶ 35. Grievant argues here that the Board erred in not fully analyzing the gender discrimination claim under the mixed motive analysis developed in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), as applied in *Graff v. Eaton*, 157 Vt. 321, 324-28, 598 A.2d 1383, 1384-87 (1991), and in concluding that UVM would have denied tenure if the gender discrimination had never occurred. In fact, the Board found that it was unclear whether grievant was alleging that she had been discriminated against on the basis of her gender under a pretext theory as described in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), or the mixed motive theory in *Price Waterhouse*. Rather than choosing for grievant, the Board analyzed her claim under both theories. Because grievant has now clearly chosen her theory, we examine that part of the Board's analysis.

¶ 36. Under a mixed motive analysis, which is guided by *Price Waterhouse*, a plaintiff has the initial burden of showing that the adverse employment action *"at the moment it was made"* was motivated by a mixture of legitimate and illegitimate reasons. 490 U.S. at 241, 244-49. Once the plaintiff shows that the decision was at least partially motivated by an illegitimate reason, the burden then shifts to the employer to show that the same decision would have been made even if the illegitimate reason had not been considered. *Id.* at 244-45. Here the Board found that "[g]rievant has not demonstrated that discrimination based on sex was a motivating factor in the decision to deny her tenure and promotion." The Board concluded that although the history department review was affected by gender discrimination, the dean, provost and president independently, with no reliance on the four statements made at the department level, found that grievant's record of scholarship was inadequate for promotion and tenure.

¶ 37. Grievant's attack on the Board's analysis largely disputes its factual findings and the conclusions based on those findings. Grievant cites to language in the decisions of the dean and provost, as well as testimony, that supports her view that the later decision-makers relied upon the record made in the history department. She particularly relies upon evidence that a tenure candidate who receives an unfavorable review at the department level is highly likely to be denied tenure, while a positive review at the department level results in tenure in 93% of cases.

¶ 38. Although grievant has pointed to evidence that might support a different conclusion, she has not shown that the Board's findings are unsupported by credible evidence as required by the standard of review. See *Butler*, 166 Vt. at 425, 697 A.2d at 661. The Board determined that during the tenure process grievant raised her concerns about the department vote, made the decision-makers aware of these concerns and then the decision-makers addressed grievant's concerns by disregarding the department votes and making their own independent findings regarding grievant's scholarship record. These findings are supported by the written decisions as well as the testimony of the dean and provost. The issue was also explicitly addressed in the president's grievance decision from which grievant appealed to the Board. Citing the review decisions after the history department action, the president found that the record "fails to support findings or a conclusion that erroneous or improper considerations associated with the [maternity] leave adversely affected the outcome of this tenure review." In essence, the Board accepted this analysis.

¶ 39. The significance of grievant's statistical evidence was disputed. Grievant drew the inference that the department chair's recommendation was all but determinative. UVM argued that the evidence showed that most applicants easily met the tenure standards and, thus, there was no negative vote at any level because of the merits of the application, not the weight of the chair's recommendation. UVM also noted that grievant received a positive recommendation from the department chair. The evidence did show that there were instances where the dean or provost did not accept the department chair's recommendation and where the dean and provost disagreed. We conclude that the statistical evidence went to weight, and the Board could reject the inference grievant sought from it.

¶ 40. Grievant next contends that the Board erred by failing to recognize the violation of a number of the written procedures applicable in the tenure review process. Some of her claims go to specific

written tenure procedures; others go to the standards applied by the Faculty Grievance Committee as discussed above. The Board analyzed both.

¶ 41. We conclude that grievant's arguments with respect to the Faculty Grievance Committee standards were not properly before the Board. As set forth above, grievant must prove to the Board a "discriminatory application of a rule or regulation" as provided in 3 V.S.A. § 902(14). Our precedents give some guidance on the meaning of that term. In *Nzomo v. Vermont State Colleges*, 136 Vt. 97, 385 A.2d 1099 (1978) (*Nzomo* I), grievant argued that the decision to terminate him as an untenured faculty member was made without compliance with certain of his procedural rights specifically given by the Castleton College Faculty Handbook. We found that this argument was within the grievance jurisdiction of the Board:

> Discrimination in this instance simply means unequal treatment of individuals in the same circumstances under the applicable rule. . . . It is clear to us that the rules as written in the Castleton Handbook are binding on the defendant, that they have not been modified by past conduct, and that the defendant has failed to apply these rules in plaintiff's case. This without more is sufficient to require a finding of discrimination which constitutes a grievance under 3 V.S.A. § 926.

*Id.* at 102-03, 385 A.2d at 1102 (citations omitted). We applied the holding of *Nzomo* I in *Boynton v. Snelling*, 147 Vt. 564, 522 A.2d 232 (1987), where a state employee brought an action in superior court seeking to require the Department of Libraries to comply with a statute giving hiring preference to current classified employees. We held that the hiring preference requirements were also contained in administrative rules and, as a result, could be enforced only through grievance proceedings in the Board. *Id.* at 566, 522 A.2d at 234. Finally and most recently in *Gobin*, 158 Vt. at 434, 610 A.2d at 151, we reiterated that failure of an employer "to follow a binding rule constitutes an actionable grievance." We held that the UVM provost's guidelines for the distribution of salary adjustments were binding rules for purposes of grievant's complaint that he did not receive the salary raise called for in those guidelines. *Id.* at 435, 610 A.2d at 152.

¶ 42. The rule on which grievant relies is unlike those in our precedents. Rather than a mandate that governs the employer's conduct with respect to employees, either substantively or procedurally, it

governs only the Faculty Grievance Committee in acting on employee grievances.[6] More important, grievant has no claim of discriminatory application as required by § 902(14). There is no allegation that UVM violated the rule in the way we have considered in the past — that is, she has not alleged that the Faculty Grievance Committee improperly applied the rule. Nor has grievant alleged or shown that UVM applied the rule differently to grievant than to others.

¶ 43. As UVM argues, the effect of holding that a grievance review standard can be the basis for a grievance filed in the Board is that the nonbinding grievance review process set forth in UVM's Officers' Handbook becomes binding because the president's decision can be appealed on its merits to the Board. As § 902(14) states, this effect can be imposed by a negotiated labor agreement between UVM and an employees' bargaining unit, but we concur that in the absence of such an agreement, the language of the grievance statute cannot be stretched to produce this effect.

¶ 44. Thus, we hold that grievant could prevail on her claim of a rule violation only if she could show violation of a specific tenure procedure rule. The rules governing the tenure review procedures within the applicant's department are quite brief. Section 231.2 of the Officers' Handbook provides:

> Department chairpersons shall regularly review the performance of faculty members of their departments and may recommend reappointment, promotion or tenure to the dean. . . . In considering whether to recommend reappointment, promotion and/or tenure, the chairperson shall request the advice of all tenured and tenure-track faculty members of the department or school. The advice of other faculty members may be requested according to a clear and consistently applied policy developed by the department or school. In making a recommendation, the chairperson shall report the extent of such consultation and the nature of the advice re-

---

[6] This is even more apparent from some of the other review standards applicable to the committee. Under Officers' Handbook § 270.5(a), the committee can grant a grievance where it finds that existing procedures were followed but the committee deems them "inadequate or inequitable." Under grievant's position, the Board would have the same jurisdiction to set aside a tenure decision, even though it was rendered after full compliance with the applicable procedural rules, because the Board found that the procedures were inadequate.

ceived. The chairperson's recommendation should be separate from the recorded opinion of the faculty.

With respect to reviewing scholarship of a tenure applicant, § 223.3 of the handbook requires the department to "solicit evaluations [of the applicant's work] from acknowledged scholars or practitioners at other institutions." This requirement is supplemented by language in the History Department Guidelines for Reappointment, Promotion and Tenure. Under *Research*, § 3(c) on "Review for Tenure" provides that "the candidate must be able to show that colleagues in the discipline recognize the importance, quality and value of his or her research," and goes on to provide that "the department will solicit letters of evaluation from outside colleagues about the candidate's research."

¶ 45. Grievant argues on appeal that four procedural defects in the tenure process should have caused the Board to grant the grievance: (1) the procedure employed by the chair of the history department in connection with the faculty review; (2) the misstatement by the chair of the standards used to judge grievant's scholarship; (3) the chair's misstatement of grievant's publication activity since her second review; and (4) the consideration of the letters of the anonymous readers of grievant's book manuscript. We note that with respect to the second and third alleged procedural defects grievant has not specified what tenure rule was violated by these actions, and none was cited to the Board. Grievant has generally argued that the chair's improper actions in connection with the faculty votes violated her right to advice of the faculty in § 231.2, but there is no indication that the rest of the faculty knew of these comments. In any event, the Board found for each of these allegations that any defect was cured by the later reviews by the dean, provost and president, who were not under the misimpressions of the history chair or faculty.[7] The evidence supports the findings which in turn support the Board's conclusion. See *Nzomo* II, 138 Vt. at 76, 411 A.2d at 1368 (where Labor Board's factual determination shows that the procedural defect did not affect "the final nonrenewal of plaintiff's contract," decision to deny reinstatement was affirmed).

---

[7] As noted above, the Board also ruled that it would not consider alleged violations of § 231.2, because the section was not cited in the grievance complaint. The complaint did specifically cover these allegations in count nos. 3 and 8, and in the latter cited to § 270.5. In view of the Board's review of these allegations, despite its waiver holding, we need not consider the waiver holding.

¶ 46. In describing the first defect, grievant criticizes the history chair for failing to disclose her opposition to grievant's tenure application, failing to advise her to submit a self-evaluation, and speaking and voting against her in the faculty meeting. The Board found that while the chair's conduct may not have been consistent with best practices, it neither violated any rules or regulations nor deviated from past practices. Based on the Board's findings and the very limited applicable rule language, we agree. In any event, consistent with the Board's earlier analysis, any defects did not prejudice grievant in the later reviews.[8]

¶ 47. We reach a similar conclusion with respect to the anonymous book reviews. The Board found that they were used solely to determine the prospects for publication of her book, and not to determine the quality of her work. There was evidence to support this finding. As with earlier issues, the dean was clear that she did not use the reviews for an improper purpose.

¶ 48. As her third claim of error on the merits, grievant argues that the Board should have considered two claims even though they were not itemized in the grievance complaint: (1) that UVM violated § 223.1 of the Officers' Handbook by not employing flexibility in judging her scholarship; and (2) that the history department chair violated § 231.1 by not sending her the recommendation of the dean for a publication strategy at first review until eighteen months after they were made. Grievant argues that the Board should have addressed the claims because they were adequately alleged in the pleadings or they were tried by the implied consent of the parties. Although the Board may have intended to respond to the second claim, it did not explicitly do so. See fn. 4, *supra*. It did, however, make a factual finding that grievant did not claim that her conduct would have been different if she had received the dean's recommendation earlier. In view of this finding, it is clear that any violation of § 231.1 would have had no effect on the tenure decision.

---

[8] One of grievant's arguments does not fit in this category. Grievant alleged that the chair mistakenly sought to help her by recommending that tenure be awarded. In fact, under the rules in effect, she argues, the recommendation prevented grievant from requesting the dean that the tenure review be resubmitted to the history department, a specifically-available remedy in case of an appeal. See Officers' Handbook § 231.32. Grievant never requested this relief until the university grievance process, although it was explicitly available from the provost. See *id.* § 231.33. In any event, we are not persuaded that the dean could not have requested revoting if she had been asked.

¶ 49. With respect to the claim of violation of § 223.1, we agree with the Board that even a liberal interpretation of the grievance complaint did not cover this claim. Moreover, grievant failed to raise the claim before the Faculty Grievance Committee as required by Board Rule § 18.1. We recognize that we have held that a pleading deficiency in a Board proceeding can be overlooked "if an unpled issue is raised at trial, and the opposing party had an ample opportunity to object and failed to do so." *Whitney*, 168 Vt. at 213-14, 719 A.2d at 878. In *Whitney*, however, the employer failed to object to the introduction of the new issue in the Board, raising an objection for the first time in this Court. In this case, the employer did immediately object when the issue was first raised in passing in grievant's post-hearing memorandum. Assuming that the implied consent rationale can overcome a deficiency in the failure to preserve the issue in the earlier grievance proceeding, an issue left open in *Whitney*, the Board acted in its discretion to hold that UVM did not have ample opportunity to object to the introduction of the issue in this case.

¶ 50. Finally, we address grievant's argument that in addition to reviewing whether UVM violated its own rules, the Board should have reviewed whether the tenure decision was arbitrary or in violation of the implied contractual covenant of good faith and fair dealing. Under this argument, grievant cites a number of defects in the tenure procedure that grievant believes made it unfair and also claims that the Board should have reviewed whether the result was substantively unfair. In making this argument defendant relies primarily on *Fairchild v. Vermont State Colleges*, 141 Vt. 362, 449 A.2d 932 (1982), a case where a professor was denied tenure. In *Fairchild*, we explained that the applicable collective bargaining agreement expressly mandated that the Board was to "dismiss any grievance involving denial of tenure unless the reasons offered in support thereof represent an 'arbitrary or discriminatory' application of the tenure criteria." *Id.* at 365, 449 A.2d at 934. Grievant's reliance on *Fairchild* is misplaced because the standard of review was set out specifically by the applicable collective bargaining agreement. *Id.* Here, there is no collective bargaining agreement, and the Board correctly stated that its standard of review for all of grievant's claims is governed by *Nzomo I*, 136 Vt. at 102, 385 A.2d at 1102, which held that the Board can consider only whether UVM violated a binding rule or regulation.

¶ 51. In her oral argument to this Court, grievant switched to the argument that an arbitrariness standard applied through the applica-

tion of § 270.5(b) of the Officers' Handbook. We have held above that the standard of review set out in § 270.5 does not apply at the Board level.

¶ 52. Our holding on the arbitrariness standard applies equally to grievant's argument that the Board should have considered whether UVM violated the covenant of good faith and fair dealing that was part of her employment contract with UVM. We see no basis to hold that the covenant is embodied in a rule or regulation.

*Affirmed.*